# WILLIAM A. TURNER v. MARY W. ANDERSON et al., Appellants.

### Division One, July 12, 1911.

1. **JUDICIAL OPINIONS: Statement.** A statement amounting to a summary, in just outline, color and connection, of the evidence of sixty-seven witnesses, extending through seven hundred and sixty-four pages of solid print, cannot be so compressed within modest and reasonable bounds as to be either intelligible or valuable, in the decision of the appellate court; and, besides, the statute requiring "a sufficient statement of the case, so that it may be understood without reference to the record and proceedings" is of doubtful validity, since the Constitution does not require such a statement, and the Legis-

lature cannot assume powers committed to the Judicial Department.

2. **WILL CONTEST: Undue Influence: Mental Condition as Evidence.** Even though the mind of the testator had been weakened by disease and a weakened mind may be more easily influenced than a strong one, there must be substantial evidence that the influence of another operated and was undue to shape the will, before it can be held to be void because of undue influence. It is not sufficient to prove influence; it must be undue.

3. ———: ———: **Of Wife: Exercise.** Proof of such overmastering influence of a wife over her husband as might guide and mould his will is not sufficient proof of undue influence. There must also be proof that such influence was exercised upon him, and that the effect of such exercised influence is the will in contest. The influence of natural affection is not sufficient, for natural affection is never condemned by the law. To be effective in breaking the will it must be of sufficient potency to destroy the free agency of testator at the time of making the will.

4. ———: ———: **Proof: Inference.** Undue influence as a rule cannot be proven by direct and positive testimony, but often must of necessity rest in inferential proof; yet one or the other or both must be present before a verdict setting aside the will on account of undue influence can be upheld. The undue influence must be present, in active exercise, and rise to the mark of such overpersuasion, coercion, force, fraud or deception as breaks the will power of testator and puts in its stead the will of another. Whenever there is substantial evidence tending to establish such influence, whether it be direct testimony or facts from which such influence naturally flows as its product, the question of the validity of the will then becomes a matter for the jury to determine; otherwise, not.

5. ———: ———: **Wife's Influence.** The testator's first wife died leaving him two daughters, one of whom married against his wishes, though there was no open rupture. He later married again, a woman twenty-six years younger than himself, and discord and a sour condition grew up between her and the two children. He was a positive, self-reliant, reticent, potent man, lacking in magnanimity and tact in dealing with his domestic troubles. The second daughter did not live at his house after his second marriage, but among relatives, but when she was about sixteen years of age she went to her stepmother and asked to come home and live, but was denied that privilege by her and later by her father. She lived with her sister a while, married a worthless man, and her father gave her money, but required her to minutely account for the sums ad-

vanced. When he was about sixty-five years of age, possessed of an estate amounting to about $310,000, he was greatly weakened by disease, nervous troubles, hernia and epilepsy, and to "please his family" went with his second wife and her two children to Europe, and before going he made a will by which he gave the bulk of his estate to his wife and her two children, and divided the balance equally between them and his two daughters by the former wife, each of the five getting under the residuary clause a considerable sum. He knew at the time he left that his married daughter was incurably sick. She died during his absence, leaving two sons. Thereafter he conceived the idea that if his will remained unchanged her husband would receive a part of it, and he added a codicil by which he gave to her children the share given by the will to her. Later he made the will in suit, giving to each of her sons $5,000, made his wife and her two sons the principal beneficiaries, and divided the residue into four parts, giving to his wife and her two sons and the surviving daughter by the first wife one part each. According to its provisions, the wife and her two sons would each receive about $88,000, the surviving daughter about $35,000, and the two sons of the deceased daughter $5,000 each. The will was drawn by testator's trusted and long-time attorney, and taken away by him and later brought back and executed and witnessed in the attorney's office. The wife was not present when the first will, its codicil, or the second will was made, or at any consultation as to either. She did not manage his business at any time. *Held*, that there is no evidence of undue influence.

6. ————: **Testamentary Capacity: Taken from Jury: No Appeal by Contestant: Reversal for New Trial.** Where the trial court instructed the jury that there is no evidence that testator was incapacitated to make a will, and submitted to them the issue of undue influence and the verdict set the will aside on that ground, and proponents alone appeal, and the verdict cannot be sustained for lack of substantial evidence to support it, the Supreme Court will not dispose of the case by a simple reversal of the judgment, where substantial evidence is preserved for review by appellants that testator's mind was so impaired that he did not have testamentary capacity to make a will, but will remand the case for new trial on that issue; and that will be the course whether or not contestant appealed from the ruling of the court withdrawing that issue from the jury.

7. ————: ————: **Evidence: Epilepsy.** Where testator, an old man, for many years had been afflicted with hernia and epilepsy, which is a disease of the brain and frequently lowers both the mental capacity and the moral sense; where his busi-

ness sense had been whimsical and poor, and the epilepsy not only virulent, but there is evidence to indicate it had become permanent, and to prevent a strangulated hernia he submitted to a major surgical operation and died in an epileptic convulsion; and where his property was managed largely by competent agents, and his attention to and knowledge of his business affairs indicated a wandering and weakened mind and a loss of mental reckoning, there is sufficient proof to carry the case to the jury on the issue of testamentary incapacity. .

8. ———: ———: **Test.** To have a mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who are the natural objects of his bounty, their deserts in reference to their conduct and treatment of him, their capacity and necessities.

Appeal from Jackson Circuit Court.—*Hon. Walter A. Powell,* Judge.

REVERSED AND REMANDED.

*Reed, Atwood, Yates, Mastin & Harvey* and *Paxton & Rose* for appellants.

(1)  The jury were not authorized to fill up gaps in the evidence by mere speculation.  Bank v. Railroad, 98 Mo. App. 330; Tibbe v. Kamp, 154 Mo. 580. (2)  There was no proof of undue influence, nor any proof that any such influence was operative in the making of the will.  Wood v. Carpenter, 166 Mo. 465; McFaddin v. Catron, 138 Mo. 197; Defoe v. Defoe, 144 Mo. 458; Sehr v. Lindeman, 153 Mo. 276; Fulton v. Freeland, 219 Mo. 494; Weston v. Hanson, 212 Mo. 248.  (3)  On the record this case ought to be reversed and remanded with directions to establish the will.  Wood v. Carpenter, 166 Mo. 465; Hamon v. Hamon, 180 Mo. 685; Teckenbrock v. McLaughlin, 209 Mo. 533.

*William H. Wallace* and *T. B. Wallace* for respondent.

(1) In a will case the burden of proving mental capacity is on the proponents of the will throughout, and never shifts. Mowry v. Norman, 204 Mo. 189; Mowry v. Norman, 223 Mo. 463; Goodfellow v. Shannon, 197 Mo. 271. (2) The testator must have sufficient mind to comprehend his property and to know what disposition he is making of it, without the aid of any other person. Holton v. Cochran, 208 Mo. 417. (3) He must have mind and memory capable of regarding and discriminating as to those who are the natural objects of his bounty and bound to him by obligations of family and blood. Roberts v. Bartlett, 190 Mo. 699. (4) Moral obligations and inequalities in the will are important circumstances bearing on the questions of mental capacity and undue influence. Meir v. Butcher, 197 Mo. 68; Holton v. Cochran, 208 Mo. 417. (5) Where there is substantial evidence to support the verdict, the court will not disturb the judgment. The court will not weigh the evidence for and against the will, but will examine the evidence to see if there is any testimony to support the finding. Hill v. Boyd, 199 Mo. 448; Roberts v. Bartlett, 190 Mo. 695; Goodfellow v. Shannon, 197 Mo. 271. (6) It is not required that undue influence should be shown by direct proof, but it may be established by proof of facts from which it may rationally be inferred. Bradford v. Blossom, 190 Mo. 139; Meir v. Butcher, 197 Mo. 91. (7) Undue influence may be shown by the relation of the parties, the mental condition of the person whose act is in question and the character of the transaction. Roberts v. Bartlett, 190 Mo. 701; Bradford v. Blossom, 190 Mo. 139. (8) While it is true that undue influence will not be presumed, yet when such facts are proven as will authorize a jury to find the existence of undue influence, the burden

shifts, and it then devolves upon the party charged to exonerate himself from such charge in like manner as in case of fiduciary and confidential relations. Roberts v. Bartlett, 190 Mo. 701; Gay v. Gillihan, 92 Mo. 263; Bradford v. Blossom, 190 Mo. 143. (9) It is not required that overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been acquired previously, and was operating at the time of the making of the will. Mowry v. Norman, 204 Mo. 193; Taylor v. Wilburn, 20 Mo. 306. (10) In some cases undue influence will be inferred from the nature of the transaction alone; in others from the nature of the transaction and the exercises of occasional or habitual influence. Harvey v. Sullers, 46 Mo. 152. (11) Gross inequalities in the will may shift the burden of proof upon the proponents of the will to prove that it was not procured by undue influence. Gay v. Gillihan, 92 Mo. 264. (12) In Mowry v. Norman, 204 Mo. 173, the presumption of undue influence was drawn not from confidential relations between the parties, but from circumstances showing control over the mind of the testator. Where undue influence is presumed in such a case, the credibility of witnesses in rebuttal is for the jury. (13) In Mowry v. Norman, 204 Mo. 192, it was held that the fact that the will recited that the testator was free from undue influence was of itself sufficient to cast such suspicion on the transaction as to send the case to the jury. So, in this case, the admitted precaution taken to guard the question of mental capacity by having the will witnessed by the family doctor and by employing the other witness to the will as counsel for the defendants in the will contest, ought to be sufficient of themselves to send the case to the jury.

LAMM, J.—In June, 1900, Mathew W. Anderson made his will. In November, 1903, he made a codicil. On March 29, 1905, he made a new will, dying January 20, 1906. Six months later plaintiff, a grandson, sued in the Jackson Circuit Court to break it. After a ten days' trial in which 67 witnesses were examined, their testimony and documentary evidence covering 764 pages of solid print, the jury broke the will, and judgment followed that verdict. Among the defendants were Mary W. Anderson, widow of testator (his second wife), and Henry Clay and Mathew William Anderson, Jr., minor sons of testator by said second wife. These defendants on due steps appeal. There were two other defendants, Nellie Anderson Harvey and Reid S. Turner (the former testator's married daughter by his first wife and the latter by his grandson, a brother of plaintiff, both of them sons of testator's deceased married daughter, Mrs. Turner, by his first wife), who do not appeal.

We allow ourselves a foreword, viz.:

Our statutes ordain that in a case determined or finally disposed of upon motion here, our opinion shall be reduced to writing and filed in the cause, and shall show which judge delivered it, and which concurred or dissented. [R. S. 1909, sec. 2087.] The next section of the statute prescribes what our opinions shall "always contain," viz.: "A sufficient statement of the case, so that it may be understood without reference to the record and proceedings in the same." Turning to our Constitution, it prescribes that the opinions of the St. Louis Court of Appeals shall be in writing and filed. [Sec. 15, art. 4, Const.] By an amendment in 1890, said Constitution is made to further provide (Sec. 3, of the amendment of 1890, R. S. 1909, p. 104) that the opinions of each *division* of the Supreme Court shall be in writing and filed.

236 Sup.—34

I am indebted to the courtesy of an erudite counselor for a reference to a case apposite to conditions thus outlined, viz., Houston v. Williams, 13 Cal. 24. In that case the Supreme Court of California, speaking by Justice STEPHEN J. FIELD, held that the decision of a court is its judgment; that the opinion is the reasons given for that judgment; that the practice of giving in writing the reasons of judgments is of modern origin; that the duty of the California court (absent a constitutional requirement) was discharged by the rendition of its decision; and that the Legislature could not require the Supreme Court to give the reasons of its decisions in writing. In that State at that time there was no constitutional provision, but there was a statute ordaining that the decisions of any appellate court should be in writing "with the reasons thereof," etc. It will be observed that our Constitution requires the divisional opinions of this court to be in writing, but says nothing about a "statement" or Banc opinions. Our statute does not rest content with the provisions of the Constitution, although that instrument created both Legislature and Court. The two are of coordinate dignity, of common birthright and sprang from the same august and noble loins—the sovereign people, speaking as sovereigns. The statute goes further. It requires at our hands a written opinion in every case whether in Division or Banc, whether it is determined by a hearing or a motion. It also requires a "statement." Mark the language, a statement of a certain scope and sort, viz., one "that shall be understood" etc. The term "understood," in the connection used by the lawmaker, invites observations. But as they spring spontaneously, any discriminating and good-humored reader can make them for himself. Heretofore this statutory mandate has been deemed either obligatory or has been obeyed in a spirit of comity or out of deference to the lawmaking power. However, a certain natural

and untoward thing has happened.    The statute is the chief factor swelling the length of appellate opinions and causing them, now and then, to be much murmured against.  For the present we reserve the point, but it may be worth while right soon to gravely consider and finally determine whether that statute is constitutional and should be longer obeyed.

Attend to the animated language of Justice FIELD, anent the California statute:

"  .  .  . It is but one of many provisions embodied in different statutes by which control over the Judiciary Department of the government has been attempted by legislation.  To accede to it any obligatory force, would be to sanction a most palpable encroachment upon the independence of this department.  If the power of the Legislature to prescribe the mode and manner in which the Judiciary shall discharge their official duties be once recognized, there will be no limit to the dependence of the latter.  If the Legislature can require the reasons of our decisions to be stated in writing, it can forbid their statement in writing, and enforce their oral announcement, or prescribe the paper upon which they shall be written, and the ink which shall be used.  And yet no sane man will justify any such absurd pretention, but where is the limit to this power if its exercise in any particular be admitted?

"The truth is, no such power can exist in the Legislative Department, or be sanctioned by any court which has the least respect for its own dignity and independence.  In its own sphere of duties, this court cannot be trammeled by any legislative restrictions. Its constitutional duty is discharged by the rendition of decisions.  The Legislature can no more require this court to state the reasons of its decisions, than this court can require, for the validity of the statutes, that the Legislature shall accompany them with the reasons for their enactment.  .  .  .  The practice of

giving the reasons in writing for judgments has grown into use in modern times. Formerly, the reasons, if any were given, were generally stated orally by the judges, and taken down by the reporters in short hand. [1 Blackstone, 71.] In the judicial records of the King's Courts, 'the reasons or causes of the judgment,' says Lord COKE, 'are not expressed, for wise and learned men do, before they judge, labor to reach to the depth of all the reasons of the case in question, but in their judgments express not any; and, in truth, if judges should set down the reasons and causes of their judgments within every record, that immense labor should withdraw them from the necessary services of the commonwealth, and their records should grow to be like *Elephantini Libri, of infinite length, and, in mine opinion, lose somewhat of their present authority and reverence;* and this is also worthy for learned and grave men to imitate.' [Coke's Rep. part 3, pref. 5.]"

We pass the matter with the suggestion that a "statement" of the instant case (giving to that term the meaning of a summary of the evidence of 67 witnesses in just outline, color and connection) could not be compressed within modest or reasonable bounds, and made either intelligible or valuable.

Accordingly, we shall give our impressions of the salient features of this case omitting details.

It was denied by contestant and affirmed by proponents that testator had testamentary capacity. It was asserted by contestant and denied by proponents that the will was the product of undue influence. Such were the issues on the pleadings and on those issues testimony went in.

Taking the laboring oar, proponents produced the witnesses to the will, made a prima facie case of a testamentary mind and offered the last will in evidence. Contestant then put in his proof on both issues and rested. Thereupon those defendants who appeal ask-

ed an instruction in the nature of a demurrer. This was refused and the point was saved. Thereupon they put in proof to rebut the testimony of contestant on both issues. Thereupon they offered, among others, one instruction coercing a verdict in favor of the will on the issue of undue influence, another to the effect there was no proof of undue influence and that matter was withdrawn from the jury, another coercing a verdict in favor of the will upon the question of mental capacity to make it, and another coercing a general verdict for defendants. These instructions were refused and appellants saved the point by an exception. Thereupon the court instructed the jury in behalf of contestant on the issue of undue influence—appellants excepting and saving the point. The court then gave to the jury on the prayer of appellants an instruction on undue influence, which instruction, *inter alia,* had a clause telling them that the only issue submitted is whether or not the paper writing offered in evidence was procured through the undue influence of testator's wife, Mary W. Anderson. To that instruction plaintiff excepted. Thereupon the court, *sua sponte,* gave an instruction to the effect that testator under the evidence had sufficient mental capacity on March 29, 1905, to make a will, and as to that issue the finding will be against plaintiff. To that instruction plaintiff excepted.

It will thus be seen that the issue of testamentary capacity was taken from the jury and that the case was left to hang on a single thread, viz., the undue influence of testator's widow, and that sole issue was submitted to the jury and found for contestant.

Appellants, waiving all other errors claimed, assign only one, viz., the court's ruling on the demurrer at the close of plaintiff's evidence, and again on the same demurrer tendered at the close of the case. The scope of that assignment is limited by counsel to one question, namely, error in not withdrawing the ques-

tion of undue influence from the jury. The brief of repondent's counsel covers both testamentary capacity and undue influence. As we interpret it their position on briefs is that not only the issue of undue influence was properly submitted but that the other trial issue, testamentary capacity, should have been submitted. As we grasp it, their position in argument at this bar was that if we should hold against them on the issue of undue influence, we ought not to reverse and remand with direction to solemnly probate the will but should send the case below to be retried on both issues.

### I. *Of undue influence.*

Testator reached three score and ten and died. Marrying the daughter of a neighboring farmer in 1861, he was then a young man, poor in property but rich in ambition and capacity. Nature endowed him richly along some lines. In person, he was commanding; in physical power, strong; in those elements contributing to business success, he was much above the average man, self-reliant, reticent, far-sighted, industrious, resourceful. Arising to his opportunities and growing with them, he achieved lucrative official and business position. The first record glimpse we have of him is as a wood hauler; the last is as president of a bank, living in affluence. When his first wife died, in 1887, he was already a rich and influential man, engrossed in managing his fortune. At that time he had two daughters—one of them, Kate, shortly thereafter married to Mr. Robert Turner; the other, Nellie, a child of seven or eight. While a widower, he maintained his home, installing therein his sister, Mrs. Franklin, as housekeeper, who seems to have taken the place of mother to Nellie. Three years thereafter, when Nellie was eleven years, he married his second wife, the defendant Mary W., younger than he by twenty-six years. At that time the Turners lived in

Mexico, Missouri, and Nellie and Mrs. Franklin made up his household. In the lines and between the lines of this record may be read the regrettable but conspicuous fact that between them all they did not well solve the delicate problem of installing a stepmother in the old home and in readjusting their family relations along pleasant and wholesome lines. Where the shoe precisely pinched and who was entirely to blame, we may not know with certainty from this record. The new wife came from her abode in Kentucky, a stranger to that household, doubtless expecting much and hoping much. Presently, there were feminine stings on both sides. To accord a just proportion of praise or blame in that behalf, is a task vain and impossible to a mortal court, and is one not necessary to assume in determining the question in hand. It is probable from record signs that the new mother was not wanted, or cordially received, hence was not unreservedly accorded an unquestioned place as head of the house. Such condition is a human one and should be faced with tact and a high sense of duty. The married daughter, Mrs. Turner, and her husband, Robert, extended no written or oral felicitations on the marriage. If that is to be taken as a breach of the amenities, it is here to be reckoned with as a cause of many evils. Mrs. Franklin for a short time continued to preside at the head of the table. Beneath a fair front of politeness on both sides there may be read the story of mutual frigidity and restraint among the women. That Nellie's mind was premeditatedly and designedly poisoned against her new mother does not appear, but that she was bitten by the prevailing frost, we think does. The father lacked the judgment, patience and tact necessary to guide and control events to an auspicious ending. Present the duty arising from her marriage and her voluntary assumption of the relation of a mother, the new mother cannot be

held without blame. The Turners were clearly at fault. To blame the young daughter, a child, is out of the question, but if there were those who made the problem difficult of solution by chilling or coloring the mind of Nellie (and results point that way), they were much to blame. It would serve no useful purpose to pursue this miserable story of domestic infelicity. The result was an arrangement, continuing for years, that Nellie should go away with Mrs. Franklin and live with her, the father making an allowance for both and afterwards educating his daughter. There is testimony on one side somewhat indicating that the new mother was responsible for this situation, and on the other that she was not. There is testimony indicating that the early breach was never healed. The Turners afterwards moved to Independence and Nellie went to live with them, but whether through mutual pride or other cause no cordial relations were established between the women of the two families. There is but dim light in the record, but that light, such as it is, shows that Turner was not a welcome son-in-law to Mr. Anderson from the outset, and that the relations between the two were more or less cold and restrained —this, both before and after testator's marriage to his second wife. Whether Mrs. Anderson merely sympathized with her husband's views, or enteretained her own, is dark, but she and Mr. Turner were never friends. Nellie married unfortunately and we may leave to oblivion the testimony tending to show it was deemed unwise on her application to take her back to her old home after she had attained the age of seventeen. Mrs. Anderson opposed it and Mr. Anderson did not agree to it. There is evidence that the father's course with his daughters in settling with them for their inheritance from their mother was grasping and unsentimental. So in taking notes from Nellie for an allowance he made her after her marriage the ten-

der offices of an affluent father seem quite lost, but there is no testimony that the defendant, Mary W., had part or parcel in these matters. There were born to the Turners three sons: one of them, plaintiff, now come to man's estate; another, defendant Reid S., is yet a minor—one died. In 1900 Mrs. Turner died. It is difficult to describe precisely the attitude of Mr. Anderson to the Turner boys. He visited his daughter, Mrs. Turner. There is faint testimony inferentially indicating that he wished to conceal these visits from his wife, but there is cogent testimony to the contrary. He gave Mrs. Turner a house and lot in Independence, valued at $4500. But he was not generous or affectionate in his treatment of his grandsons. He refused financial aid to one of them in a trip west. If he made them presents they were small and wide apart. But the record is barren of any evidence worth while that Mrs. Anderson influenced him in his bearing or relation to them. If she was remiss, it was the remissness of indifference. Between them and her there were no friendly relations. The cause must be left to speculation. Doubtless, if found, it would be seen to be uncomplimentary to either side, and the blame for her part of it would rest on her shoulders, and for theirs would likely originate in the feelings of their parents. Mr. Anderson was not profuse in his gifts to Nellie but he took a kindly interest in her welfare. There are facts from which it might be inferred that some of these gifts were furtive, and that he did not want his wife to know he had given them. On the other hand, there is testimony that she never interferred with his attentions to her, or undertook to dam up the flow of his natural affections. Two children were born to Anderson by his second marriage, both of them yet minors. At a certain time he took them and their mother to Europe. Something is made of this trip as tending to show the hostility or callous in-

·difference of defendant, Mary W., to her stepchild and her influence over her husband. At the time of that trip Mrs. Turner was incurably ill with a swiftly developed consumption, and her doctor informed Mr. Anderson she would not be likely to live until his return. He expressed solicitude over taking the trip and gave as an excuse that he did it to please his family. He took it and she died in his absence. On the other side, it is an unquestioned fact that at that time Anderson's health was broken and he was afflicted with an insidious and incurable nervous disease demanding rest, recuperation and medical attention. He was in charge of an eminent specialist, who suggested the trip and went with him to Europe. We think if he went to please his family, as he said, the family pleasure might well spring from natural solicitude over his own condition. He owed a divided duty, choosing to go to Europe with his physician. Before he went he made his will on June 20, 1900. At the time of his death he was seized of an estate, real and personal, valued at $310,000. We get the impression that it was practically of the same value at the time of that will. By that will, after giving the bulk of his estate to his wife and two sons, he divided the residue into five parts, giving one to his wife, one to each of his two sons, one to Nellie and one to Mrs. Turner. We have no data to determine the value of the residuary estate under the first will, but the case runs on the theory on both sides that it was considerable. In November, 1903, he made a codicil to that will adding to the legacy of his son Mathew William, giving some directions in regard to the disposition of government bonds bequeathed to both sons, and. directing by item 3 thereof, that, as Mrs. Turner had died since the execution of his will, he gave and devised unto her children the part of his estate devised to her by the principal will. He nominated his wife as executrix and requested that no bond be requir-

ed of her, otherwise confirming his last will and testament. Subsequently, one of the three sons of Mrs. Turner died, and there is some testimony indicating that Mr. Anderson became solicitous about Turner inheriting from his sons, and that his old-time chronic feeling against him was operating in his mind. We shall have more to say presently about the physical and mental condition of Mr. Anderson for four or five years preceding his death. Suffice it to say now his disease, as said, was an incurable nervous disorder, had made inroads upon his mind and body. He was a sick man, suffering from an aggravated hernia and epilepsy. Two years after adding the aforesaid codicil (viz., in 1905), he made a new will.

We will not set it forth in so many words. Summarizing it, the principal beneficiaries, as in the former will, are his wife and two sons. His two grandsons no longer participate in the residuary fund, but each of them receives the sum of $5,000. The residue is then divided into four parts, one to his widow, one each to his two sons and one to his daughter Nellie. There is a forfeiture clause in which it is provided that if any of his heirs in person or by guardian or next friend institute a contest, such contestant shall receive nothing, but his bequest shall merge into the corpus of the residuary fund. It is estimated by learned counsel for respondent that under that will the widow gets $88,000, each of the two sons $88,000, Nellie $35,000, while the Turner boys together get $10,000. Such estimated distribution is not controverted by appellants' counsel. That will was drawn by his attorney, Mr. Clements, and witnessed by him and by his physician, Dr. Twyman. Mr. Clements was his trusted legal adviser of long standing and drew the former will and its codicil. There is not a particle of testimony that Mrs. Anderson was instrumental in procuring or drawing the 1905 will or in any wise hovered over the transaction. She did

not appear in connnection with the consultation before it was drawn. The consultations were those usual when weighty and confidential matters are discussed between client and attorney and were held in the attorney's office. Neither had she part or parcel in the preparation or genesis of the original will or its codicil so far as this record discloses. There is no testimony she managed his business affairs or dictated his course in business matters. To the contrary, there is testimony that he and his agents managed his affairs. She did not. There are indications that he confided to her the contents of the will after it was written, but such confidence was natural. When the rough draft was drawn, he took it with him to think over, and the next morning returned it and ordered the forfeiture clause inserted. We may not infer, in the absence of an iota of direct or inferential proof, that she saw the draft or was the author or instigator of that clause. She appears in this record as a faithful wife, worthy her husband's confidence. If she got it, the law accords with human nature in permitting him to give and her to get. There are sundry unpleasant incidents mentionable (some reflecting on one, some on the other side of this controversy), earmarking the exceeding bitterness of the quarrel, but they do not affect the merits.

The question, then, is this: Under such record was plaintiff entitled to go to the jury on the theory the will was the product of the undue influence of Mrs. Anderson? We think not.

Conceding to plaintiff that the mind of testator was weakened by the ravages of disease and that a weakened mind may be more easily influenced than a strong one, precisely as the wind that bends a willow or breaks a weakling spends itself harmlessly upon the oak, yet to break a will for undue influence, there must be evidence of substance tending to show that the influence of another was operated and undue

in order to make the paper writing, presented for solemn probate as a will, the will of another, and not that of testator. The proof of influence alone is not sufficient. It must be *undue*. Nay, the proof of such overmastering influence of one spouse over another as might mould and guide the will of the other is not sufficient. There must be evidence that such influence was brought to bear, and that the effect was produced or sprang naturally by way of inference from facts proven. Conceding that undue influence cannot as a rule be proven by direct and positive testimony, but oft must needs rest in inferential proof, yet we have read this record in vain to find such inferential proof. Undue influence to be effective in breaking a will should be of sufficient potency to destroy the free agency of testator at the time of making the will. The influence of natural affection is not sufficient; for natural affection may flow at all times and its waters are under no ban known to the law. The undue influence that will break a will must be present, in active exercise and rise to the mark of such overpersuasion, coercion, force, fraud or deception, as breaks the will power of testator and puts in its stead the will of another. [Teckenbrock v. McLaughlin, 209 Mo. l. c. 521, and cases cited; Fulton v. Freeland, 219 Mo. 494.] We have time and again taken occasion to say that the only object of the Statute on Wills is to permit the owner of property to take it out of the Statute of Descents and Distribution, and to dispose of it unequally by his domestic decree, in which decree he sits as a chancellor on the equities of his heirs and his own domestic affairs. An unnatural will cannot be broken merely because unnatural. Its harshness and unnatural features only operate when coupled with present facts tending to show undue influence when that is the issue, or testamentary incapacity when that is the issue. A testator when writing his will need not write it as a supplication to a jury, viz.: "I wish my prop-

erty to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.'' [Lynch v. Doran, 95 Mich. l. c. 409; Conner v. Skaggs, 213 Mo. l. c. 249; Meier v. Buchter, 197 Mo. l. c. 86, *et seq.*]

We are of opinion the court committed error in refusing the instructions offered by appellants taking from the jury the issue of undue influence. Respondent's case in that behalf rests, we think, on a fog of suspicion and conjecture; and the jury's verdict, absent testimony of any probative value tending to show undue influence, must be referred to a natural human sympathy for grandsons cut off from their mother's share in an estate ample in their opinion for the wants of all the heirs if equitably distributed.

II. *Of testamentary incapacity.*

The court below determined the question of testamentary capacity as a matter of law on the evidence educed and took that issue from the jury. As we have determined that the judgment cannot stand on the issue of undue influence found in favor of contestant, we are confronted with the question whether we will reverse and remand the case generally or reverse and remand with directions to probate the will. Sometimes we have done the latter. [McFadin v. Catron, 138 Mo. l. c. 227; Story v. Story, 188 Mo. l. c. 129; Hamon v. Hamon, 180 Mo. l. c. 702, are samples of such disposition of cases.] In Bradford v. Blossom, 207 Mo. l. c. 234, we reversed a judgment establishing a will, and gave directions to enter one rejecting the will. It is not worth while to discuss the questions whether there is anything so peculiar about a will case that appellate courts refer to those pecularities as grounds for so adjusting their judgments and mandates as to attain the ends of justice, or whether the practice in that behalf is referrable alone to statutes regulating the disposition of cases on appeal. It is

sufficient to refer to the practice and let it stand as its own reason. It is also settled practice to reverse and remand for a new trial generally where that course meets the ends of refined justice. The statute says (R. S. 1909, sec. 2083) that we shall award a new trial, reverse or affirm the decision of the circuit court, or give such judgment as such court ought to have given as to us shall seem agreeable to the law. The practice under that statute has been flexible enough to permit the award of a new trial on the whole case, or on a certain issue, or to retry by eliminating pointed out errors, or to retry on a certain theory of the law, or by including or excluding certain evidence. [Donnell v. Wright, 199 Mo. 1. c. 317.]

In this case contestant took no appeal. He was not "aggrieved by the judgment of any circuit court in any civil cause" (R. S. 1909, sec. 2083), and therefore could not appeal. He was not entitled to a bill of exceptions to be brought here for review. If he had taken his exceptions and had them preserved in a bill, that bill would have lain below on the appeal of proponents. [Patterson v. Patterson, 200 Mo. 1. c. 342, *et seq.*] In such condition of things, if we refuse to consider the testimony on testamentary incapacity our refusal would amount to one of two things, viz.: Thereby we would (1) indirectly (willy nilly) sustain the ruling taking that issue from the jury whether we were of opinion it was right or wrong; (2) or (if we conclude it was wrong) we would turn contestant out of court without a just determination of that issue—a theory palpably abhorrent to refined justice. In this case we are relieved from all embarrassment by the fact that appellants necessarily brought the testimony relating to testamentary incapacity to this court for our consideration. It was an essential element in the determination of the question of undue influence. We have read that testimony with pains. Undoubtedly there was testimony, and a good deal

of it, which, if the jury believed, would result in a verdict sustaining this will on the theory that testator had a testamentary mind. On the other hand, we cannot shut our eyes to the fact that there is testimony plainly tending to show that his mind was impaired. He was an old man. For many years he had not only been afflicted with hernia but with epilepsy. Epilepsy is a disease of the brain. It frequently develops into a disease of the mind, and lowers away the ethical or moral sense. In old people it progresses, according to some of the testimony, into *senile dementia* when it becomes a falling sickness, is attended with convulsions and spells of unconsciousness, as was the case here. The testimony shows two forms of it, one *petit mal*—a little sickness—another *grand mal*—a great sickness. Testator for years was afflicted with both kinds. He lost greatly in weight. There was evidence on the part of contestant tending, we think, to show that his mind was affected certainly at times, and, we think, some of it tends to show permanently. In the face of a new trial we deem it the wiser course not to discuss the testimony and give our impressions of it in detail. Testator clearly was not the business man he had been. His business sense had become whimsical and poor. He kept a great estate to the end, but he had powerful aid in competent agents. Under some of the testimony, his personal attention to and knowledge of his affairs and property were of such sort toward the close as indicated a wandering and weakened mind—a mental reckoning lost. To prevent a strangulated hernia, he submitted to a major surgical operation and died as the result of an epileptic convulsion without recovering from the effects of an anesthetic administered by the surgeon.

To have a mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of

his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one. [Crum v. Crum, 231 Mo. 1. c. 638, *et seq.,* and cases cited; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. 1. c. 699; Meier v. Buchter, supra.] There is a question (debatable, but here) on this record whether testator had a mind of that kind.

Our conclusion is that the cause should be reversed and remanded generally for a new trial. If contestant's case at that retrial, on the question of undue influence, is not supported by more substantial evidence, it should not be submitted to the jury. If contestant at that retrial is able to make substantially the same case (or a better one) on the question of testamentary incapacity, that issue should be left to the arbitrament of the triers of the fact.

Accordingly, the judgment is reversed and the cause remanded for a new trial in accordance with views herein expressed. All concur.