WILLIAM F. (FRITZ) BECKMANN, and ROSA BECKMANN, his wife; HENRY C. BECKMANN and ANNA BECKMANN, his wife; ANTON BECKMANN; CAROLINE BAUMANN, and FRED BAUMANN, her husband, and KATIE SCHROEDER and ERNST SCHROEDER, her husband, v. AUGUST BECKMANN and ELSIE BECKMANN, his wife; FRIEDA BECKMANN; OSCAR BECKMANN; MAYME BECKMANN; ELIZABETH BECKMANN; ELIZABETH (LISSIE) AMES, and LUCAS AMES, her husband, and ELIZABETH AMES, Executrix of the purported will of DIEDRICH BECKMANN, Appellants.—52 S. W. (2d) 818.

Division One, September 3, 1932.

134

*R. E. Kleinschmidt* for appellants.

*Allen, Moser & Marsalek* for respondents.

136

FERGUSON, C.—This is a statutory will contest. The plaintiffs, William F. Beckmann, Henry C. Beckmann, Anton Beckmann, Caroline Baumann and Katie Schroeder, are five of the children of the testator, Diedrich Beckmann, by his first wife. August Beckmann, a child of testator by his first wife, and his three children, Frieda, Oscar and Mayme, testator's grandchildren; Elizabeth Beckmann, the second wife and widow of the testator and Elizabeth (Lissie) Ames their only child, are defendants. The petition charges that testator's widow, who was his second wife, and his daughter "Lissie," the only child of testator by that wife, "procured said Diedrich Beckmann to make said alleged will by exercising undue influence over the mind of the said Diedrich Beckmann." No answer was filed by the defendant August Beckmann. One defendant, Oscar Beckmann, son of August Beckmann and a grandchild of testator, died before the trial of the cause. The other defendants answered. Abandoning the charge made in the petition that the will had been procured through an undue influence exercised by the daughter, the defendant Elizabeth (Lissie) Ames, plaintiffs, by their instructions, submitted the case to the jury upon the issue of an undue influence exercised by the wife, defendant Elizabeth Beckmann, alone. The verdict of the jury was against the will and from the judgment thereon the answering defendants appealed. Appellants assign as error the refusal of the trial court to give an instruction in the nature of a demurrer to the evidence peremptorily directing the jury to find that the paper writing introduced in evidence was the last will of Diedrich Beckmann, which defendants offered at the close of plaintiffs' evidence and again at the close of all the evidence in the case.

Certain issues quite commonly found in will contests are not present in this case and the principles of law applicable to such issues can have no direct bearing upon the determination of the one remaining issue to which we come by a process of elimination. The petition does not allege testamentary incapacity and under the evi-

dence there is no issue of testamentary capacity, in the case. It is alleged in the petition that Elizabeth Beckmann (the wife) and Elizabeth (Lissie) Ames, the daughter, by the exercise of an undue influence over the mind of the testator induced him to make the will in question but plaintiffs being unable to point to so much as a scintilla of evidence tending to sustain the charge against Elizabeth (Lissie) Ames abandoned the charge as to her. While it is alleged in the petition that a fiduciary relation existed between the wife, defendant Elizabeth Beckmann, and the testator, there was no substantial evidence offered to support the allegation and thereby raise a presumption of undue influence with the burden upon defendants to rebut it. No fiduciary relation being shown the only question remaining in the case for our consideration is whether there is sufficient evidence in the record, of a substantial nature, tending to show that the will in question was the product of undue influence exercised by the wife of testator to warrant the submission of that issue to the jury.

A will case is a law case and on defendants' demurrer to the evidence or, as in this case, motion for a directed verdict, the contestants are entitled "not only to the full force of all their uncontradicted testimony but to have their evidence taken as true where contradicted" and a final demurrer "permits a search of all testimony to determine if contestants' case is abetted by defendants' proof." In considering a demurrer, offered at the close of all the testimony, it is our duty to allow contestants the benefit of every reasonable inference which a fair minded jury might legitimately draw from the whole evidence in the case but the evidence "must be of such a nature as to afford substantial proof" of the charge of undue influence made the basis of attack upon the validity of the will and "forced and violent inference not flowing from a reasonable interpretation of the facts shown" cannot be allowed. [Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039; Huffnagle v. Pauley (Mo.), 219 S. W. 373; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46.] "Yet he has had but slight experience as a practitioner who has not observed the readiness, not to say eagerness, with which juries seize an opportunity to break wills, never doubting their ability better to decide what should be done with a man's property than the man himself could do. Hence it follows that in will cases the courts scan and scrutinize the evidence with a searching, though impartial, eye, and weigh it in the scales of reason and experience, in order to ascertain whether or not it furnishes a sufficient basis for the submission of such delicate questions to a jury." [Huffnagle v. Pauley (Mo.), 219 S. W. 373, 378.]

By a preliminary statement based upon uncontradicted facts, taken largely from contestants' evidence, we undertake a sketch of the history of this family and the circumstances surrounding the execution of the will. The testator, Diedrich Beckmann was of German descent. While he could converse in both the English and German languages he preferred German and that language was generally used by his family. He was a resident of Jefferson County, Missouri, and in 1876 purchased 200 acres of land and later, in 1881, 110 acres of land, in that county. He owned and resided on the 310 acres of land continuously until his death. This land is referred to in the evidence as the "home place." It was the only source of livelihood and support of his family and himself. This farm or "home place" and a small amount of personal property of a value less than $500, constituted his entire property and estate at the time of his death in June, 1927, and is the property disposed of by the will. One witness for plaintiffs, a husband of one of the contestants, testified that at the time of Beckmann's death this land was worth $9,000. Other wholly disinterested and well-qualified witnesses placed the value of the land at from $3,000 to $5,000. In 1876 Beckmann married Frieda Witte who died in 1893. Six children born of the marriage survived the mother, William, referred to in in the will and at times in the evidence as "Fritz," Henry, Anton, Katie and Caroline who are the contestants herein, and August, who did not join in this contest and was made a defendant. William the oldest child was past sixteen years of age at the time of his mother's death; the age, at that time, of Henry, the second child, is not given. Anton was twelve years of age but the age of August the next child is not given; Katie was ten years of age and Caroline six months of age. The baby, Caroline, was placed with the Froelich family, who lived on a farm about three-quarters of a mile distant from the Beckmann place. She was never returned to her father's home, but was reared by the Froelichs as a member of their family, and resided there until some time after her marriage at the age of twenty-two years. There is no blame or criticism whatsoever made in this record, by anyone, of the father, or of the wife whom he later married, that Caroline was never returned to her father's home. The fact that she was reared in the Froelich home, and as a member of that family, seems to have been agreeable to all parties concerned and to have resulted from mutual attachment and affection. Katie also was sent to live with the Froelich family. August was placed with the Coffman family, neighbors and friends. Shortly after the mother's death the two oldest boys, William (Fritz) and Henry left their father's home and seemed never to have thereafter lived at the home of their father except at perhaps short and occasional intervals. The record

discloses no friction whatsoever between these two boys and their father nor were they sent away by their father. The inference is that they left, of their own volition, to shift for themselves and that they did not thereafter make their home with or assist the father in any substantial way. Anton, though a boy of twelve at the time of his mother's death, continued to live at the home place with his father. He made his home on the farm with his father continuously until 1921, when he was forty years of age. He never married. He worked on the farm and as he testified he was by trade a carpenter, we assume he also, to some extent, carried on that trade. Part of the time after attaining his majority he worked on the farm under an arrangement with his father whereby he received a certain share of the crops. About a year after the death of his wife Frieda, Diedrich Beckmann married a woman of German descent, the defendant herein Elizabeth Beckmann. At the time of the marriage he was forty-eight years of age and the wife thirty-seven years of age. Immediately upon his marriage Beckmann brought Katie and August to his home but, as we have stated, Caroline was permitted to remain with the Froelich family. About a year following this marriage the only child of the marriage, the defendant Elizabeth (Lissie) Ames, was born. The record does not disclose how long August remained at the family home, but, apparently of his own volition, he left while yet a young man and we find reference in the evidence indicating that in later years and over a considerable period of time he rented land from his father which he farmed. Katie remained at home until she was sixteen years of age and during that time "went to school in the winter and in the summer helped in the house work and field." At about sixteen years of age Katie "went to the city," then came home "for awhile" but returned "to the city" and never lived with her father at home after that time and was married about 1912. Elizabeth, the only child born of the second marriage, was reared in the home and lived there continuously until the death of her father. The married life of Diedrich and Elizabeth Beckmann extended over a period of thirty-three years closing with his death in 1927 at the age of eighty-one years, her age at that time being seventy years. The testimony shows Diedrich Beckmann to have been industrious and frugal. He seems to have been a sturdy, patient, reticent man. Those of his children who testified in this case, with one accord, say he was of a kindly disposition. There seems to have been a hard struggle through all the years to make the farm, his only source of livelihood, support the family but he managed his affairs with thrift and frugality. All of his children except Anton and Elizabeth left home, of their own desire, at an early age nor did they thereafter render him any material assistance. Naught but the

friendliest relations however existed between him and his children. There is no evidence tending to show that he at any time manifested any ill will, displeasure or prejudice toward any of his children. The last three years of Beckmann's life he was afflicted with what was described as a "running sore" on his foot which interfered at times with his freedom of movement and required the use of a cane. The doctor who had been the family physician for twenty-five years testified that "diabetes was the chief cause of his death," that he had treated Beckmann for diabetes for two years preceding his death and that Beckmann "had a running sore about his heel and foot in connection with diabetes, which had to be bandaged for two years prior to his death." The wife and daughter "Lissie" looked after the treatment and bandaging of the foot and leg but even during this period he was not wholly inactive or confined to his bed though "he would sometimes take to his bed for a day at a time." No witness testified to any indications or appearances of mental impairment or weakening of the mind or judgment at any time. The inevitable conclusion from the composite testimony is that testator was a man of strong and vigorous mind and will power. The evidence pictures the daily routine of the wife Elizabeth as that of toil and frugality, she did "the cooking, washing and ironing for the family," "milking," "tended the chickens," "picked berries and canned fruits," "dug potatoes," "worked in the fields," "pitched hay," and "kept house" and when "Lissie got larger she helped her mother" in these tasks. For nine years a brother of testator lived on the farm, apparently, as a member of the family and about three years before testator's death two of his grandchildren came to live with him. The wife of his son Gus died, and Gus sent his two daughters Frieda, age fourteen years and Mayme, age eight years, to live at their grandfather's home, where they were residing at the time of this trial. These girls were received into the family and "supported and cared for." They are defendants in this action. On August 4, 1922, five years prior to his death Diedrich Beckmann, unaccompanied by any member of his family or any relative, went to Hillsboro, the county seat, and alone called at the office of an attorney, Frank Dietrich, and told the attorney he wanted a will written. Beckmann "stated exactly the way he wanted to dispose of his property." Mr. Dietrich made notations and prepared the will accordingly. Beckmann was in the office of the attorney for about an hour during which time the will was prepared, executed and attested. Mr. Dietrich and the attesting witnesses were called as witnesses by proponents in the trial of this cause and a prima-facie case was duly made. Omitting the formal declarations of the first and the concluding paragraphs and the attestation clause, the pertinent parts of the will are as follows:

"First: I direct the payment of all just debts and expenses.

"Second: I give and bequeath to my wife, Elizabeth Beckmann, all of my real, personal and mixed property of every kind, nature and description, to have, hold and use for her natural life with power to sell and dispose of same, if necessary for her support, and at her death, all remainder of my estate shall go to the following children and grandchildren.

"A. My son Anton shall receive One Thousand Dollars.

"B. My son August, Two Hundred Dollars.

"C. And my grandchildren, One Hundred Dollars each, named Frieda, Oscar and Mayme Beckmann.

"D. My daughter Lissie Ames, shall receive all the residue and remainder of my estate free and clear from all right, claim, title whatsoever of her husband.

"E. My children, Fritz, Henry, Katie Schroeder and Caroline Baumann shall receive nothing from my estate.

"Third: I hereby appoint and name Lissie Ames to act as Executrix of this my will without bond."

In the fall of 1926, approximately nine months before his death, Beckmann went alone to Antonia stating to one of his neighbors enroute that "he wanted to see Judge Miller and have him look at some papers." Judge Miller was cashier of the Bank of Antonia where Beckmann transacted such banking business as he had. Miller had been a justice of the peace and had served eight years as probate judge of that county. He spoke the German language fluently and Beckmann had confidence in his advice and judgment. On this occasion Beckmann went alone to the bank and told Miller he wanted to talk to him privately. They went to the director's room and Beckmann took this will from an envelope and asked Miller to examine it and tell him whether it "is good and legal." The whole conversation was in the German language. Miller read the will, then read it aloud to Beckmann, explained its provisions and legal effect, asked Beckmann "if it was his will" and whether that was the way "he wanted to dispose of his property and he said it was." Miller then inquired "if anybody asked him to make his will this way and he said 'no'" and said "that Mr. Dietrich had written the will and he had told him the way he wanted it and he (Dietrich) put it down that way." With this background based upon the uncontradicted facts in evidence we come to a statement of the evidence upon which plaintiffs must rely and which they claim makes a submissible case.

The plaintiffs' case is based wholly upon the testimony of four of the contestants, Anton, William (Fritz), Katie and Caroline. There is not an iota of evidence from any other source to support plaintiffs' case. Henry the other contesting child did not testify nor was contestants' case in any manner aided by the testimony

offered by defendants. Anton testified that on one occasion (the time is not fixed but it seems to have been somewhere about 1914) while witness was living at his father's home and working on the farm on a share crop basis, his stepmother complained that the witness would leave home during the day and remain away until late at night and that she said "unless different arrangements were made (apparently referring to the work on the farm) neither one would get any pay out of it" and that he had heard his stepmother say, "if she couldn't have her own way she would sue for a divorce." The last statement alleged to have been made by the stepmother is vague, the time is not fixed nor does it appear under what circumstances or in what connection the statement was made nor is there anything to indicate that she referred to the management or disposition of her husband's property. An approximation as to the time of such statement would place the time at many years prior to the making of the will in 1922. It will be recalled that Katie left home, of her own desire, at about the age of sixteen years. She lived in the home with her stepmother during a period of approximately five years, 1895 to 1900, both inclusive. Anton testified that during that period he had heard the stepmother tell Katie, "she would never make a housekeeper and that she was dirty" and "in that way an argument would start" between them and during some of these arguments he had heard his stepmother say, "I will see when the will is made you never get a cent." This was at least twenty-two years before the will in question was made. Further Anton stated that about 1912 his father told him that he was going to "will the place to him" (reference being to the farm, the only real property owned by testator and disposed of by the will) but that "his wife and daughter (stepmother and testator's daughter by her) shared in the place" and that he (Anton) "ought to buy them out." This proposition however, does not seem to have been further discussed. The witness said he had "never heard the stepmother undertake to order his father to do things." Katie's testimony referred to the period she lived at her father's home prior to 1900. She testified that she "didn't get along very well with her stepmother" and that at times when her stepmother was angry at her she would say: "I will see that you don't get as much as any of the rest;" that her stepmother "never said what her father should or should not do around the place" but she had heard her say, apparently in reference to some of the work about the farm or house, "if you don't do it the way I want I'll leave;" and that she never heard her stepmother say anything to her father about the management of his property or the disposition of it. William, who left home shortly after his mother's death and before his father's marriage to Elizabeth and who never

thereafter returned to his father's home to live, testified, that in 1912 he was working near his father's farm and his father asked him "to come and cut some large trees for him," that he was engaged in that work for his father about two weeks and on one occasion during that time when he and his father were in conversation the stepmother said: "If you have to have a conversation and not work you can sit in the house where it is warm." Another incident related by witness was that sometime in 1903 he and his father and Uncle Fritz, his father's brother, were sitting in the kitchen at his father's home, talking and the witness was recalling how his mother worked in the fields and that "she could handle more hay than any man" when the stepmother interrupted and said: "because your mother worked hard I am going to see that you ain't going to enjoy it" and that thereupon his father "went out doors." William further said he had never heard his stepmother make any remarks regarding his father. Caroline who, as we have explained, was reared in the Froelich home as a member of that family and never lived at the home of her father, testified that she frequently visited in the home of her father, "was always treated nicely," "they were always kind to me" and she "never had a falling out or dispute with her stepmother." This cordiality however was interrupted for a short time as the result of a school girl "fuss" between the stepsister "Lissie" and the witness but the stepsister apologized and friendly relations were resumed. Three of these four witnesses Anton, Katie and Caroline referred to an incident which they say occurred in 1917, five years before the execution of the will, during a birthday dinner and party at the Beckmann home in honor of the father's birthday. There is a variance in the testimony of the witnesses as to what was said by their stepmother but the implication which plaintiffs make is the same. William (Fritz) and Henry were the only children absent and as Caroline states the incident the father remarked, "if Fritz and Henry were here all the children would be together" and that the stepmother said, "don't consider them your children if they are not here."

■■ "By 'undue influence' is meant such influence as amounts to force, coercion or over-persuasion, which destroys the free agency or will power of the testator." [Sehr v. Lindemann, 153 Mo. 276, 54 S. W. 537.] Undue influence to be effective in breaking a will must have been present, in active exercise and sufficient to destroy the free agency of the testator at the time of the making of the will so that the will is not "in fact his own will, but that of the party who was exercising the undue influence." [Gibony v. Foster, 230 Mo. 106, 130 S. W. 314; Turner v. Anderson, 236 Mo. 523, 139 S. W. 180; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; Winn

144

v. Grier, 217 Mo. 420, 117 S. W. 48; Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039; Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40.] But the law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by testator. [Teckenbrock v. McLaughlin, supra; Winn v. Grier, supra; Bushman v. Barlow, supra.] ■ We find no direct proof in this record tending to show undue influence or the dominance of the wife's mind over that of testator at the time he executed the will or at any other time. He was a man of intelligence. He went alone to an attorney of his own selection and stated in a clear and explicit manner how he wanted to dispose of his property and some four years later conferred privately with Judge Miller in whom he reposed confidence and with whom he could discuss the matter in his favorite language and on that occasion fully confirmed the will. There is not a word of testimony that the wife at any time during the thirty-three years of their life together discussed with the husband the making of a will or the disposition of his property or ever suggested, importuned or besought her husband to execute a will disposing of his property in the manner in which he did or in any other manner. The mere fact, even had it been shown, that a wife and husband discuss the disposition of the property and provision, by means of a will, against the hour of death and separation would have no significance. Such would be both natural and proper. We repeat there is no direct evidence that the wife at any time, near or remote, exercised, or attempted to exercise, influence of any character upon testator's mind in the making of his will. As said in the beginning no fiduciary relation having been shown there is no presumption of undue influence. Plaintiffs therefore must rest their case upon the inferences they attempt to draw from the facts and circumstances shown by their evidence. ■ It is true that "undue influence need not be shown by direct evidence. It may be shown indirectly and arise as a natural inference from other facts in the case," but "it must not rest on mere opportunity to influence, or on mere suspicion." [Teckenbrock v. McLaughlin, supra.] As the writer reads the evidence the physical ailment which beset Beckmann during the last three years of his life had not taken hold upon him in 1922 when he executed the will. Moreover, the evidence consistently shows that he was of sound, clear and vigorous mind to the time of his death. His mind and judgment was at no time impaired or his will power weakened. In view of the evidence to that effect, and none to the contrary, the allegation in the petition that at the time he executed the will testator was "mentally and physically sick . . . and subject to undue influence" is without support in the evidence. We discover no circumstances in the evidence of a sufficiently substantial nature to sustain an inference that the wife

dominated or controlled the mind and judgment of her husband or tending to show him to have been in a state of mental vassalage. Contestants' contention is resolved to this, that they testified to statements made by their stepmother from which they claim an inference may properly be drawn that the stepmother harbored hostility toward certain of the children of the first wife and since no provision was made in the will for William (Fritz), Henry, Caroline and Katie and Anton was not bequeathed as much as he thought he should have therefore they concluded that sometime, somehow the stepmother gained and maintained ascendency over the mind of their father to such an extent as to enable her to control his judgment and prevail upon him to make the will in the manner in which he did contrary to his own judgment and desires. The evidence hardly warrants an inference that there was any fixed feeling of ill will or sustained hostility on·the part of the stepmother toward any of the children. The alleged remarks about and to the fifteen or sixteen year old Katie, in 1889 or 1900, made in moments of irritation and anger, the flare-up toward William in 1903, and the remarks at the birthday party in 1917 concerning the absence of William and Henry is about the sum total of the evidence relied upon as tending to show a deep seated and lasting animosity toward the children of the first wife. Aside from the remark about Henry's absence from the birthday party nothing whatsoever occurred in the thirty-three years to indicate any ill feeling toward him and nothing of any significance was shown as to Anton, William, Caroline or Gus. All of the children of the first wife, who lived at their father's home, except Anton, of their own choice, left home at an early age each to pursue his or her own way and thereafter, so far as the record shows, rendered their father no substantial assistance. Two of the boys left home before their father's marriage. None of the children were required by their father or stepmother to leave nor did their stepmother, so far as their own testimony shows, have anything whatsoever to do with their leaving. None of them claim that the attitude of their father toward them underwent any perceptible change through the years. Plaintiffs' conclusions are predicated upon their idea that the will is unnatural and, according to their view point, inequitable and their suspicion that their stepmother in some manner influenced their father in the making of the will. But the evidence is satisfying and convincing that testator knew what he was doing, and, of his own free will, did what he desired and had a right to do. The inference that plaintiffs draw from the testimony are forced inferences resting upon mere opportunity to influence, conjecture and suspicion and are not therefore sufficient to sustain or support the charge of undue influence. In the light of the facts the will can hardly be classed as

unnatural. The husband devised to his wife, an aged and, as the evidence shows, infirm woman approaching the sunset of life, a life estate with power to sell the fee "if necessary for her support" and after her death specific bequests of $1,000 to Anton, $200 to August and $100 to each of the three motherless children of the son Gus with the residue, if any, to Lissie Ames. William (Fritz), Henry and Katie had voluntarily left the parental home early in life, made their own way, married and established their own homes. Caroline had been reared in the Froelich home as a member of that family, married there and established her own home. Lissie had lived with her father since birth, worked in the fields, about the house and cared for him personally in the days of his physical affliction. That his first concern was to make provision for his wife and youngest child was evidenced in 1912, ten years before he made the will, when he told Anton he would will him the farm but that his wife and daughter Lissie "shared in the place" and "he (Anton) ought to buy them out" but Anton evidently did not see fit to pursue or further discuss the proposition. Except this vague statement appearing in Anton's testimony there is no evidence tending to show that Beckmann ever wished, desired, or expressed any intention to dispose of his property in any manner other than that in which he did. Whatever claims contestants felt they had upon their father's bounty the property was nevertheless his and with the absolute ownership of property goes the right of arbitrary disposition of same "according to the untrammelled volition of the owner." "The feelings of a father towards his children, whether of partiality or prejudice, not engendered by fraud, deceit, mental incapacity or such influence as to subdue his mind and destroy his free agency is not sufficient to set aside a will of his property, although it be shown that the making of same was moved by the feelings referred to." [Bushman v. Barlow, supra.] Even an unnatural will should not be invalidated merely because it is unnatural. "Its harshness and unnatural features only operate when coupled with present facts tending to show undue influence when that is the issue, or testamentary incapacity when that is the issue. A testator when writing his will need not write it as a supplication to a jury, viz: 'I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.' " [Turner v. Anderson, supra.]

A critical review of the evidence fails to show any testimony from which a reasonable, natural and fair inference can be drawn that the will was procured through the exercise of an undue influence by the wife over the mind of testator. In the absence of any substantial evidence to sustain the issue of undue influence the judgment of the trial court is reversed and the cause is remanded with the direction

that a judgment be entered establishing the paper writing, introduced in evidence, as the last will and testament of Diedrich Beckmann. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.