EDITH E. DOUGHERTY, RESPONDENT, v. THE MUTUAL LIFE INSUR-
ANCE COMPANY OF NEW YORK, APPELLANT.—44 S. W. (2d) 206.

Kansas City Court of Appeals.   December 7, 1931.

*Tyree Burton* and *Roy McKittrick* for respondent.

*Meservey, Michaels, Blackmar, Newkirk & Eager* and *Frederick L. Allen* (of counsel) for appellant.

TRIMBLE, P. J.—This is an action at law on a policy of life insurance for $2000, brought by the beneficiary therein, widow of John M. Dougherty, the insured. The trial court, sitting as a jury, rendered judgment in plaintiff's favor for the full amount due on the face of the policy plus additional insurance and dividends with interest, "less the premium due April 12, 1923, and all subsequent premiums to and including the premium due October 12, 1925," with interest at five per cent on each from due date to January 20, 1926, and less a loan on the policy of $147.26 with six per cent interest from August 30, 1922, to January 20, 1926, leaving "amount due plaintiff," at this last named date, the sum of $1673.81 which, with interest at six per cent from said date to the rendition of judgment, made the "total amount due plaintiff $2054.30," the full amount of the judgment. The defendant appealed.

The policy, though *dated* August 30, 1918, was not *delivered* until October 12, 1918. Insured died December 23, 1925.

The original petition alleged, in substance, that the application was made August 26, 1918, and the policy was issued and delivered October 14, 1918; that insured paid all premiums due "up to and including the one demanded on the — day of May, 1923;" that by the terms of the policy insured was entitled to extended insurance; that insured died December 22, 1925, notice thereof was given and demand made for $2000 "less such sum due defendant on said policy." The policy was attached to the petition.

The amended petition, in addition to alleging the making of the application and the issuance and delivery of the policy, set up that the annual premiums were $76.16, the first of which was paid on the delivery and acceptance of the policy; that insured "by reason of the payments of the premiums for a period of more than three years was entitled to extended insurance" without any action on

his part, and that he offered to and did comply in all respects with the conditions and provisions of said policy and that said policy was in full force and effect at the time of his death on December 23, 1925; that notice was given and demand made; that defendant has refused and now refuses to pay and is justly indebted to plaintiff in the sum of $2000 with interest, "less any sum that may be due the defendant under the terms of said policy."

The answer set up, among other things not material now, that the policy was issued August 30, 1918, on insured at age forty-four for for an annual premium of $76.16, payable *August 30th* of each year; that insured died December 23, 1925.

The answer then denied that said death occurred during the continuance of the policy, and alleged that said policy "was not in force or value, and had become finally lapsed and valueless and void long prior to the date of the death of insured by reason of the nonpayment of premiums due under the terms of said policy and by reason of the failure to repay at the time when due a certain loan on said policy" made by defendant to insured November 2, 1921, and thereinafter more fully set forth.

The answer further alleged that in the year 1919 insured requested to be allowed to pay the premiums quarterly instead of annually, which was granted, and time for payment of premiums was changed to a quarter annual basis, so that "thereafter a quarter annual premium of $20.18 became due on said policy payable on the last day of February and on the 30th days of May, August and November of each year."

The answer then set up that by the terms of the policy all premiums were payable in advance with thirty-one days grace, and that no premium payment should maintain the policy in force beyond the date when the next premium came due. [The various policy provisions relating to these matters and regarding reinstatement, loans and nonforfeiture values (cash surrender, paid up insurance and extended insurance) were set out including the table of such values as contained in the policy.]

The answer further set up that on or about November 2, 1921, insured obtained on the security, and assignment, of the policy, a loan of $147.26, and executed, with plaintiff, a note therefor payable August 30, 1922, with interest at six per cent, and providing that it might be extended from time to time for one year on payment of interest and premium then due, and if default in any premium should occur the loan should mature on the due-date of said premium, but so long as premiums were duly paid the loan would be extended automatically, interest being added to the principal on each due-date of the loan, *so long* as the loan, with accrued interest, did not *equal* or *exceed* the cash value of the policy *but not other-*

*wise;* that a *portion* of the proceeds of said loan was used to pay premiums on the policy and the *balance* was paid to insured; that on several occasions the policy lapsed for nonpayment of the quarterly premiums, and that insured *admitted* the lapse in writing and *requested reinstatement,* furnished evidence of insurability and paid the premiums in default; that the premium due on February 28, 1923, was *not paid* when due, or within the grace period, and that the policy *again lapsed* and the loan *became due;* that insured did not thereafter (as permitted in the policy) apply for the *cash surrender* value or for *paid up* insurance, and defendant *did* thereafter, as required by the policy, *cancel the indebtedness* and apply the *net cash* value of the policy to the purchase of *extended* (or continued) nonparticipating term insurance, and so endorsed the policy for $1955 of such insurance to run for a *period of two years and ninety-six days* from February 28, 1923; that defendant *returned* the policy, so *endorsed,* to insured who thereafter *retained* it; that after the lapse last referred to no application for reinstatement was made; that about June 29, 1923, insured mailed to defendant a check for $20.27 to pay, as he stated, the premium due May 30, 1923, and that "through clerical error and mistake" a purported receipt therefor was *sent to insured,* but within a few days thereafter defendant *informed insured* of said error and that such payment *could not be accepted* because of the nonpayment of the previous premium, *unless* evidence of insurability was furnished and the prior premium paid; and a blank application for reinstatement was sent to insured; that insured, however, *did nothing more,* and in August, 1923, defendant *returned to insured* the said sum of $20.27 (by its check) with the policy *endorsed for extended insurance* as aforesaid; that insured *received and cashed* said check, *retained* the money and *retained* the policy so endorsed and *made no criticism* of defendant's acts but *acquiesced* therein, plaintiff is *estopped* from questioning the correctness of the endorsement or defendant's acts as stated; that the period of extended insurance was the full amount to which insured was entitled by law or by the terms of the policy; that the extended insurance *expired* prior to his death and *no* insurance was then in force. The answer closed with a general denial.

Plaintiff's reply denied all new matter and stated: that defendant *deducted the loan* of $147.26 plus interest $4.42, total $151.68, from the face of the policy and the dividend additions, "and thereby *waived* its right to *again deduct* the loan and interest from the cash value of said policy."

The reply further set up that "the deduction of $151.68 from the cash value of said policy in payment of the note executed by insured was wrongful and in violation of the terms and conditions of said

loan agreement and at the time that said cash reserve was applied to the payment of said loan, said note was not matured and due."

The reply further stated that on April 29, 1923, defendant mailed to insured notice of the premium alleged to be due May 30, 1923, and thereafter on June 20, 1923, defendant mailed to insured, and insured received, said notice that the premium alleged to be due May 30, 1923, was past due and unpaid; that insured, in response to said notices, sent to defendant on June 29, 1923, a check for $20.27, and on July 2, 1923, defendant mailed to insured a receipt of the payment of said quarterly premium, which said receipt was duly countersigned by the authorized agent of the defendant July 2, 1923.

The reply further stated that on February 28, 1923, and thereafter, defendant had in its possession, *declared and allotted dividends due the insured and applicable* to the payment of the premium claimed by the defendant to be due; that defendant at no time subsequent to the 28th of February, 1923, and prior to July 2, 1923, by notice or otherwise, made any claim that the premium asserted by the defendant to be due had not been paid; and that by reason of the acts and conduct of the defendant as aforesaid, in continuing to *recognize* the existence of the policy as being in full force and effect and thereby *leading the insured to believe* that the policy was in full force and effect, defendant *waived* its right, if any it had, to *assert a forfeiture* of the policy by reason of the nonpayment of the premium it alleged was due on February 28, 1923.

On the trial, the following facts were developed which are undisputed:

The application for the policy was signed August 26, 1918, the policy was dated August 30, 1918, and it was delivered and the first annual premium of $76.16 was paid, on October 12, 1918. The application contained a provision that—

"The proposed policy shall not take effect unless and until the first premium shall have been paid . . . and unless also the policy shall have been delivered to and received by me . . ."

John M. Dougherty was born July 24, 1874, and his nearest birthday at date of application and policy made his age forty-four.

According to the terms expressed in the *policy*, all premiums, after the first one, fell due on the 30th of August in each year. However, during the year 1919, which necessarily was before the second annual premium fell due, under any view of when that was, the insured made application to pay the premiums quarterly instead of annually. Consequently no annual premium was paid on August 30, 1919 (the due-date according to the *terms* of the policy), but, within the grace period of thirty-one days, to-wit, on September 29, 1919, a quarterly premium of $20.18 was paid.

If the due-date of the annual premium was August 30th, then the first quarterly payment, after that of September 29, 1919, would fall due on November 30, 1919, and the next would fall due February 28, 1920. Neither of these quarterly payments were paid at these dates, and on April 19, 1920, insured (pursuant to privileges allowed by the policy when it had become null and void for default in the payment of any premiums), made application to have said policy reinstated and "placed in full force and effect" by his paying and the company accepting "the two premiums of $20.18 each, . . . *due November 30,* 1919, and *February 30, 1920,* with interest thereon to date of payment." Accompanying this application, and made a part of it, went proof of insured's present good health and insurability. And it was further agreed by insured in said application that such "placing in force" should not take effect until the application shall have been finally approved at the Company's home office in New York City, "nor until said premium and interest shall have been paid." Said application further stated that "in consideration of the *placing in force* of the said policy, insured agreed to certain other things not necessary to specify here. The application was approved and the policy was reinstated.

The next quarterly payment, which defendant claims was due May 30, 1920, was paid within the grace period thereof.

But the quarterly premium of $20.18, claimed by defendant to be due August 30, 1920, was not paid on said due-date or within the grace period thereafter, and insured, on October 18, 1920, signed an application for reinstatement of the policy without medical examination (which, according to the insurance contract, could be done if application was made within ninety days from default in the payment of the premium). This application for a second reinstatement of the policy was made, as stated above, on October 18, 1920, and in it insured again requested the company "to accept the premium of $20.18 . . . *due August 30, 1920,* with interest thereon to date of payment, and to place said policy in full force and effect," which he agreed should not take effect until approval of application nor unless said premium and interest were paid when application was made. In it insured also stated that the statements therein are offered to the Company "as an inducement for it to waive the *default which has occurred* in the payment of the above mentioned premium . . . and to reinstate said policy . . ." (Italics ours.)

This application was accepted and, on payment of the premium and interest, the policy was again reinstated.

Thereafter, the quarterly premiums which, by the terms of the policy, fell due November 30, 1920, February 28, 1921, and May 30, 1921, were not paid at said dates nor were they paid within the

thirty-one days after each date. Consequently, insured, on August 19, 1921, executed a third application for reinstatement of the policy, which was in the same form as the other two and in which the Company was requested to "accept the premium of each $20.18 . . . due 11/30/20, February 30, 1921, May 30, 1921, with interest thereon to date of payment and to place said policy in full force and effect." On the theory that he was more· than ninety days in default, insured submitted to medical examination and sent the report thereof along with the application. It was approved, the policy was reinstated and all premiums were then paid up to August 30, 1921. This premium money was paid August 27, 1921. The premium due August 30, 1921, was paid September 29, 1921.

On November 2, 1921, insured obtained a loan of $147.26 on the policy. At this time the policy had been in existence three and one-fourth years. Loans are based on the *cash* value of the policy, and this cash value at the end of the fourth policy year was $130.56; but the "prior divided additions" were sufficient to increase the loan value from $130.56 to $147.26, the amount of the loan obtained. In order to get the benefit of the cash value as of the *end* of the fourth policy year, the remaining quarterly premiums of said fourth year, namely, those of November 30, 1921, February 28, 1922, and May 30, 1922, were paid in advance by insured out of the proceeds of said loan of $147.26, and the balance of said loan, plus $1.19 interest on the premiums paid in advance, making a total of $87.91, was sent by check to insured and his wife and the same was cashed by them, and the cashed or paid check came back through banking channels to the company on November 12, 1921. As security for this loan of $147.26, insured assigned and delivered said policy to the company.

The quarterly premium of $20.18, regarded as falling due August 30, 1922, was paid September 29, 1922, within the grace period of thirty-one days, at which time insured paid $7.27, the interest due on his loan to August 30, 1922. No further interest on said loan was paid by insured at any time.

The quarterly premium, regarded as falling due November 30, 1922, was not paid within the grace period of thirty-one days thereafter, and so insured on January 13, 1923, made a fourth application for reinstatement which was in all respects like the third except that it referred to the premium of $20.18 as being "due November 30, 1922." Insured's check of $20.68, for this unpaid premium with interest, accompanied the application; and the two were accepted and the policy was reinstated. This made the policy in force with all premiums paid up to and including November 30, 1922. No other application for reinstatement was ever made.

The next premium, regarded as falling due February 28, 1923,

was never paid by insured. He seems to have been under the impression that his check of $20.68, dated January 13, 1922, was a payment of the February, 1923, premium, for on July 3, 1923, after he had sent the company a check of $20.27, for the quarterly premium of May 30, 1923, the defendant wrote him a letter acknowledging receipt of said check of $20.27 "sent for payment of quarterly premium due May 30, 1923," and then said:

"We greatly regret to advise that owing to the fact that the quarterly premium February 30, 1923, has not been paid, *we are unable to accept this remittance* for the purpose intended *until* we have your check to cover the lapsed quarterly premium of $20.18 and the attached application for re-establishing policy completed in full by you before Dr. V. Q. Bonham of Fayette, Missouri. (This was insured's place of residence.)

"On receipt of this form properly completed and your check of $20.18, the matter will be submitted to our Home Office for favorable consideration.

"To avoid possible loss or complications, we have deposited your check for collection, *proceeds held subject to your order,* pending action by our Home Office. *If our course does not meet with your approval,* kindly advise *and we will immediately return the amount to you."* (All italics ours.)

To this, insured replied on July 10, 1923, acknowledging receipt of the Company's letter of July 3, "stating that you had not received my payment due February 30, 1923," and continuing as follows:

"On January 13, 1923, I mailed you check, made out to the Mutual Life Insurance Company, and signed said check, *but did not fill in the amount,* which amount was *filled in by you for $20.68,* this check was indorsed by the Mutual Life Insurance Company. If you deem it necessary I will send you the check which has been returned to me cashed." (Italics ours.)

On July 28, 1923, the Company replied, saying "the check of January 13, 1923, was used to pay the quarterly premium due November 30, 1922."

The letter continued:

"No doubt you recall at the time this check was mailed, we advised you the policy was lapsed, and you furnished the Company with a personal health statement.

"Will you, therefore, kindly let us have your check of $20.18, together with the Application for re-establishing Policy as requested in ours of July 3rd?"

Insured made no reply to this.

Manifestly, insured's check of January 13, 1923, for $20.68 was not a payment of the February, 1923, premium, and was not in-

tended as such by insured at the time it was written, because his letter of that date. inclosing the check was sent prior to the time the said February premium became due, and hence it was not necessary to include any interest in the check, yet the letter says he (insured) signed and sent the check "but did not fill in the amount, which amount was filled in by you for $20.68."

It will be observed also that the Company answered said letter, as shown above, on July 28, 1923, telling him his check was for the November 30, 1922, premium, and calling his attention to the fact that, at the time referred to, "we advised you the policy was lapsed and you furnished the Company with a personal health statement." And the letter closed by again asking for the check of $20.18 with application for reinstatement as requested in the Company's letter of July 3rd.

Under the terms of the policy, insured had three months after default in a premium to apply for the *net cash value* of the policy, or to have it endorsed for nonparticipating *paid up* insurance or for *extended* insurance, but he did nothing of this kind nor did he even attempt to exercise any of the options open to him. The terms of the policy providing these options read as follows:

"Option on Surrender or Lapse, after three full years' premiums shall have been duly paid, the owner not less than three months after any default in payment of premiums, may elect one of the following options:

"(a) To surrender this policy for its cash value less any indebtedness to the Company; . . . or

"(b) To have the insurance continued in force from the date of such default as nonparticipating insurance, for an amount equal to the face of this policy and any outstanding dividend additions less any indebtedness to the Company hereon; or

"(c) To surrender this policy for nonparticipating paid up life insurance payable at the same time and on the same conditions as this policy."

As the premium of February 28, 1923, was not paid then, nor within thirty-one days thereafter, and as nothing was done by insured, either in the way of an application for reinstatement or to select an option provided for as above, the Company, after the expiration of more than three months, cancelled on its records the indebtedness created by the loan, ascertained the cash value of the policy, and after deducting therefrom the said indebtedness, applied the remainder of such net cash value to the purchase of continued or nonparticipating term insurance from the date of February 28, 1923, and endorsed the policy for term insurance of $1955 to run for a period of two years and ninety-six days from said February 28, 1923.

Said endorsement so placed on the policy is as follows:

"The premium due the last day of February, 1923, not having been paid, this policy is continued from such date in accordance with the provisions of the clause entitled 'Options on Surrender or Lapse' as paid up term insurance for $1,955 payable if the insured dies within two years ninety-six days from such date, but not otherwise. Such term insurance will be without participation in the surplus of the Company and without the right to loans and cash value. . . ."

Having placed this endorsement on the policy, the Company inclosed it in a letter to insured, dated August 20, 1923, in which it also returned the proceeds of the check insured sent the Company as his premium of May 30, 1923, and which the Company had formerly in its letter of July 3rd, refused to accept as payment of such premium but had deposited and held subject to insured's order pending action on reinstatement application, if insured decided to make one, and which it had promised to return if its course did not meet with insured's approval. Said letter is as follows:

"We attach herewith our check of $20.27 tendered by you under date of July 3rd in payment of premium under above policy. *We are returning this amount to you* as the policy lapsed for nonpayment of quarterly premium due February 28, 1923. *We also inclose herewith above numbered policy* as paid up term insurance for two years and ninety-six days.

"*The Company will be pleased to consider reinstating this policy* provided you have the Certificate of Health enclosed in ours of July 3rd, executed before Dr. V. Q. Bonham of Fayette, Missouri, and return to this office with premiums past due. Kindly return the attached warrant at place indicated in pencil and return to this office immediately in the enclosed stamped envelope." (All italics ours.)

Upon receipt of this letter with policy inclosed and endorsed as above, the insured made no reply nor protest, but received and *retained* the policy, *cashed* the check for $20.27 and retained the proceeds thereof.

(Although the policy had been reported to the Home Office as lapsed, it seems that a notice had been sent to insured some fifteen to thirty days in advance of the due-date of May 30, 1923, to pay the premium due on that date; and apparently in response to that notice, insured sent the check of $20.27 as a payment on the premium dated May 30, 1923; and a receipt was sent insured on July 2, 1923. Defendant's evidence is that the sending of this notice with reference to the premium of May 30, 1923, and the receipt given therefor was the result of mistake on the part of a clerk of defendant's who failed to notice that insured was already in default on the premium of February 28, 1923. However, the *next day* after

said receipt was sent, defendant wrote the letter to insured, dated July 3, 1923, refusing to accept the check as a payment of the premium of May 30, 1923, because of default in the February, 1923, premium, and agreeing to hold the proceeds *subject to insured's order*, pending his payment of the February premium and the outcome of any application on his part for the re-establishment of his policy, all as set forth in said letter hereinbefore set out.)

It would seem that the reception of the $20.27 and the sending of the receipt therefor on July 2, 1923, was manifestly an error which did not mislead or deceive insured in any way to his hurt, since the error and issuance of the receipt was clearly discovered the next day, and insured was told the check for $20.27 could not be accepted as a payment of the premium of May 30, 1923, for the reason insured was in default as to the February premium, as undoubtedly he was if the same was due then. Moreover, he was given an opportunity to pay the February premium and have his policy reinstated and the $20.27 applied to the payment of the May 30, 1923, all of which he was urged more than once to do; but to these urgings he made no reply and did nothing to change his situation. It ought not to be the law, and, so far as we are advised, it is not the law, that an insurance company must not be allowed to escape the effect of a mistake even where that mistake is immediately corrected and insured notified and given further opportunity to relieve the situation he was already in before the mistake occurred, and to be reinstated in all his rights under the policy. For under such circumstances the mistake is harmless and results in no deception of insured. And the keeping of the $20.27 check until insured could have time to comply with the requirements asked and until the proceeds were returned to insured, after he had failed to comply, did not give any additional rights to insured or plaintiff, or enable them to obtain any, by reason of the error above mentioned. [Gould v. Equitable Life Assur. Society, 231 N. Y. 208, 215-216.]

Not having heard anything from insured, after sending him the policy endorsed for two years and ninety-six days' extending insurance together with the proceeds of the refused check for $20.27, the Company on September 21, 1923, again wrote insured calling his attention to its former refund of the quarterly premium tendered by him and the receipt therefor accompanying it, and that the latter had been returned unsigned to the office; and a duplicate receipt was inclosed with request that it be signed and returned in the inclosed stamped envelope. This letter was the last communication made by defendant to insured, and the cashing of said check for $20.27 and the return of the receipt therefor by insured was the last knowledge of insured's acts received by the Company from insured. He lived slightly over two years and 120 days

after the policy, endorsed for two years and ninety-six days' extended insurance, and the refund check for $20.27 were sent him, and for two years and eighty-seven days after he had cashed the refund check and sent in a receipt therefor. The extended insurance provided by the endorsed policy was for two years and ninety-six days from the date of the defaulted premium, to-wit, February 28, 1923, but insured lived for two years and 275 days thereafter.

We shall not go into the question of whether the trial court should have sustained defendant's demurrer to the evidence at the close of plaintiff's case in chief, for the reason that defendant did not stand on its demurrer but went on to put in its case. Hence the first demurrer was abandoned and the demurrer offered at the close of the entire case is the one to be considered. [Lorton v. Missouri Pac. R. Co., 267 S. W. 385, 389.]

Should the final demurrer have been sustained? A determination of this question calls for a discussion of the evidence and of the parties' contentions and theories of the case. We do not think the question can be answered merely upon the effect or manner of the pleading. Plaintiff's case as submitted is bottomed in large part on the effect created by the fact that the policy was not delivered, nor the first premium paid, until October 12, 1918. We have heretofore quoted the provisions in the policy as to when the policy should take effect. And, unless the acts and communications of insured have changed the situation, it is clear that notwithstanding the dates specified in the policy as the times of payment of premiums, the above mentioned provision governs. [Bigalke v. Mutual Life Ins. Co., 34 S. W. (2d) 1019.] Therefore, unless changed by insured's acts as above stated, the quarterly premium due-dates, after the first premium payment of October 12, 1918, should have been the 12th days of January, April, July and October. Consequently, the second premium, instead of falling due November 30, 1919, in reality fell due January 12, 1920, and the third premium, instead of falling due February 28, 1920, actually became due April 12, 1920. So that, even under this view, insured was in default as to the first of these two premiums when he, on April 19, 1920, applied for and obtained the re-establishment of his policy. No default was made in the payment of third quarterly premium under either view. And, under the view hereinabove stated, the fourth quarterly premium did not in reality fall due until the 12th day of October, 1920, instead of August 30, 1920. Consequently, insured was not in default as to this premium (for he had the grace period of thirty-one days after October 12, 1920) when he, on October 18, 1920, again applied for and obtained the reinstatement of his policy.

The next quarterly premiums treated as falling due November 30, 1920, February 28, 1921, and May 30, 1921, in reality did not become

due until the 12th days of January, April and July, 1921, respectively. Consequently, insured was in default as to all three of these premiums when he, on August 19, 1921, made his third application for, and received reinstatement of his insurance. And he was more than ninety days in default in the payment of all these except the last.

The next quarterly premium due ostensibly on August 30, 1921, but, unless affected as above stated, really due on October 12, 1921, was paid within the time, to-wit, September 29, 1921.

At the time insured obtained his loan in November, 1921, the policy had been in force three years and twenty days according to the above view. And out of this loan of $147.26, the three payments ostensibly falling due November 30, 1921, February 28, 1922, and May 30, 1922, but in fact falling due on the 12th days of January, April and July, 1922, were paid in advance by insured out of this loan in order to get the benefit of the cash value as of the end of the fourth policy year, which did not arrive until October 12, 1922. The Company sent to insured the balance of said loan, together with $1.19 interest on the premiums paid in advance. If the interest had been calculated with regard to the due-dates now being considered the interest would have been a cent or two more than $1.19. At any date, had the calculation been made with reference to these last mentioned due-dates the advantage, though exceeding slight, would have been with insured.

The quarterly premium, treated as falling due November 30, 1922, in reality fell due January 12, 1923, and insured would not be in default until the end of the grace period of thirty-one days thereafter; nevertheless on January 13, 1923, one day after default, insured made his fourth application for reinstatement and sent with it his check for said premium of $20.18 plus interest, supposed to be due, of fifty cents, making the check $20.68, thus giving the Company fifty cents interest to which, in reality, it was not entitled; and insured as a matter of fact needed no reinstatement since the check of $20.68 was sent within the grace period from the true due-date of January 12, 1923.

The next quarterly premium ostensibly due February 28, 1923, but in reality due April 12, 1923, was never paid by insured, although he fell under the impression that his check of $20.28 was a payment of this premium. But it was explained to him that this check was for the *preceding* premium, and his attention was called to the fact that he had been told the policy had lapsed and that he had sent a personal health statement. At the time the above explanation was made, to-wit, July 28, 1923, insured was in default as to the last above mentioned premium even on the theory that April 12, 1923, was its true due-date, with May 13, 1923, as the limit of its

grace period. Hence the Company was still within its rights in requesting, as it did, a check for the payment of said premium together with an "Application for Re-establishing Policy." But, as hereinbefore stated, insured made no such application nor did he pay said premium then or indeed at any time thereafter.

After waiting to allow insured time to comply with this request, and until more than three months after the expiration of such last named due-date, the Company on August 20, 1923, returned the proceeds of the check sent for the next premium which the Company theretofore had refused to accept and had written insured it was holding such proceeds subject to his order and his further action, and that if this did not meet with his approval the Company would "immediately return" the proceeds of said check to him; and the Company also inclosed, with such returned proceeds, the policy, not as "forfeited" or cancelled as plaintiff contends in her brief, but endorsed for paid-up term insurance for two years and ninety-six days. It is true this paid up insurance was made to run from February 28, 1923, treated as the due-date by both parties to the contract, but even had it been made to run from the true due-date of April 12, 1923, this would have made no difference, because even then insured's death occurred two years, eight months and eleven days thereafter which was far beyond the term of any extended insurance that could have been granted from said true due-date.

With reference to the effect of not paying the premium last above mentioned, the terms of the policy provide that—

"*Except as herein provided* the payment of a premium or installment thereof shall not maintain this policy in force beyond the date when the next premium or installment of premium is payable. If any premium or installment thereof be not paid before the end of the period of grace, then this policy shall immediately cease and become void, and all premiums previously paid shall be forfeited to the Company *except as hereinafter provided.*"

. . . . . .

"The term for which the insurance will be continued under option (b), or the amount of the paid up life insurance under option (c), will be such as the net cash value obtainable under option (a) will purchase at the attained age of the insured at date of default when applied as a net single premium.

"In the event of default in payment of premium, if this policy shall not, within three months after such default, have been surrendered to the Company at its Home Office for its cash value as provided in option (a), or for paid up insurance as provided in option (c), the insurance will be *automatically* continued as provided in option (b)." (All italics ours.)

There having been a default in the payment of the above men-

tioned quarterly premium, under either view as to the due-date thereof, and the effect of this default not having been avoided, nor even attempted to be avoided, by the insured although given more than one opportunity to do so, how can it rightly be said that the Company "wrongfully" declared a forfeiture of the policy or that it wrongfully endorsed the policy in the way it did, which was in strict accordance with the terms of the policy in the situation brought about by such default? Much is said in plaintiff's brief, and numerous cases are cited, anent "forfeiture;" but what was done by the Company was not a "forfeiture" of the policy nor a change of the policy to a different kind of insurance effected by the Company solely on its part, but a mere following or an observance of the terms of the policy, and an essential part of the insurance contract in the situation created by the aforesaid default. In other words, by its own terms, the policy lapsed for default in the payment of said premium and the endorsement of the policy by defendant was merely an exercise of the right to invoke the *self-acting* policy provisions. While the change from an ordinary life to term insurance might perhaps, to *that extent,* be called a forfeiture in a sense, yet no question of forfeiture, as that term is used in the cases cited, is involved in this case. [Payne v. Mutual Life Ins. Co., 195 Mo. App. 512, 516; Cupp v. Security Mutual Life Ins. Co., 117 Mo. App. 532; Security Life v. Leeder, 41 Fed. 600, 602.]

Plaintiff now asserts that her "position is that the policy was alive as an ordinary life policy, up to and at the time of insured's death, and the action of the appellant in lapsing and forfeiting the policy as of February 28, 1923, did not put in force and effect, the provision of the policy with reference to extended insurance, the policy continued as an ordinary life policy because of the wrongful action of the appellant in attempting to limit the policy to term insurance for a period of two years and ninety-six days."

But this position is directly contrary to both the original and amended petition for they both bottom the cause of action on plaintiff's asserted right to "extended insurance."

Furthermore, in view of this, no reliance can now be had on "wrongful forfeiture" for the issues raised by the pleadings cannot be abandoned in this way nor can the issues and declarations of law be broader than the pleadings. [State ex rel. v. Allen, 313 Mo. 384; Kart v. Brockman, 247 S. W. 417; Allen v. Querens Lumber Co., 182 Mo. App. 280.]

What has been said hereinbefore with reference to the effect of the default in the premium last considered, is upon the theory that the *policy* due-dates of the quarterly premiums were changed and governed by the delay in the delivery of the policy. Of course if, by reason of insured's acts and communications, he recognized and

agreed to the policy due-dates, then they would remain in force, but plaintiff's rights under the policy, or under it as endorsed by defendant, would be in no better situation. There are cases holding that, nothstanding delay in delivery of the policy, the due-dates of the premium payments specified in the policy itself may become fixed and unchanged on account of the acts of the parties to the contract and what was done by them under it. [McConnell v. Provident Savings L. A. Society, 92 Fed. 769, 771-2, and other cases.] But there is no necessity of deciding whether insured recognized or impliedly agreed to the policy due-dates or not, since under either set of due-dates there is no difference in the rights of the plaintiff, as has been hereinbefore shown.

It is urged that if the Company had applied the *dividends* to the payment of the premiums the policy would not have even been open to the charge of lapse for a far longer period after default than the date used. The contention possibly may be that had the dividends been so applied to the payment of premiums the policy would have been still alive as an original contract of life insurance. As said before, however, the cause of action is not based on this theory, but on the theory that a lapse had occurred and extended insurance arose which had not expired at insured's death. Even had the case not been bottomed on this theory, nevertheless, the claim that dividends should have been used to apply on premiums cannot avail anything. In the first place, there is nothing in the policy providing for or requiring the application of dividends to the payment of premiums where there has been default in payment of premiums. On the contrary, the policy directs the use of dividends, in that emergency, for an entirely different purpose. And so far as we can perceive, they were applied in augmentation of the amount when due under the policy which includes the payment or cancellation of the admitted indebtedness, in strict accordance with the terms of the contract in reference to dividends and any possible indebtedness. At least there is no actuarial, or indeed any other, evidence to the contrary.

It is urged that it was the duty of defendant to notify insured of the amount of the dividends, and that as the record is silent as to any such notice, the defendant "waived the prompt payment of premiums and could not declare a forfeiture." As we have already said, "forfeiture" is not involved herein. But even if a *partial* forfeiture is to be deemed involved in the change to the endorsed policy, of which we fail to find any evidence, nevertheless the provision in the policy permitting the application of dividends to the payment of premiums, being one of four options granted insured by the "Participation" clause of the policy, does not apply to the situation where the policy is lapsed, but only to the disposition to be made

of the dividends during the life of the policy prior to a default or lapse. It permits such application after the *second* year's premium has been paid and, upon notice to insured, he is granted the four options, one of which he may then exercise.

The *three* options in the provision applying to "Surrender or Lapse" require the payment of *three* full years' premiums, after which the owner "not later than three months after any default in payment of premium" may elect one of them as the method of determining what shall be done with the policy, not what shall be done with reference to the payment of premiums, for it is dealing with a situation where the payment of premiums has ceased, and in this provision nothing is said about notice to insured. Indeed, nothing is said anywhere in the policy about notice to insured as to the payment of premiums. Naturally, as that is a matter of which he is necessarily aware, no notice to him that they are about to fall due is needed, though customarily such notice is given. We have not been cited to any decision, nor can we find any holding that, under the situation here presented, dividends must be applied toward the payment of premiums.

But when insured was, after repeated notice, informed that the policy had been endorsed for $1995 term insurance and the length of that term and of the application of the dividends accrued, he took no steps to indicate any dissent or objection to what had been done. And this brings up the question whether he did not consent to, or acquiesce in, all that is involved in the endorsement on the policy? We think it should be said that he did. He not only received and retained the policy as endorsed for two years and four months, but he also cashed the refund made him of the amount he mistakenly wanted to have applied on another and succeeding premium. He made no objection whatever to what was done, though he had the most explicit information in regard thereto. [Cooper v. New York Life Ins. Co., 211 S. W. 548, 549; Christensen v. New York Life Ins. Co., 160 Mo. App. 486, 500, citing New York Life Ins. Co. v. Thomas C. Fletcher, Exc., 117 U. S. 519; American Ins. Co. v. Neiberger, 74 Mo. 169, 173; Faith v. Home Life Ins. Co., 203 Mo. App. 196, 199; Steinberg v. Phoenix Ins. Co., 49 Mo. App. 255, 265.] As bearing on the point that the endorsed policy was accepted as the final contract, see 6 Couch on Insurance, sec. 1407; Home Ins. Co. v. Lumber Co., 126 Ga. 334; Mutual Life Ins. Co. v. Phinney, 178 U. S. 327, 341-344; Mutual Life Ins. Co. v. Sears, 178 U. S. 345; Mutual Life Ins. Co. v. Hill, 178 U. S. 347.

Finding of fact No. 35, as modified and given by the court, shows that in arriving at the sum of $1955 of extended or term insurance and the length of time for which it was granted, namely, two years and ninety-six days, defendant computed these matters in accordance

with the requirements of the policy and as of February 28, 1923. If this had been done on the theory that April 12, 1923, was the true due-date of the premium involved, the amount of the extended insurance may have been slightly increased, but the length of the term thereof, if lengthened at all, still would not be long enough to include, or even extend to, the date of insured's death.

Our nonforfeiture statute, Section 5741, Revised Statutes 1929, grants extended insurance on policies three years or more old, and the terms of the policy also grant automatic extended insurance where the insured does not (within three months after the due-date of a defaulted premium) apply for its surrender value or for paid up insurance. The actuarial evidence offered by defendant shows that the statute and the statutory method of computation are less favorable to plaintiff than the one provided by the terms of the policy. The plaintiff was entitled to claim under the most favorable method, which she did. But while the courts allow a plaintiff to choose between the policy and the statutory method in regard to . the computation of extended insurance, they have never, so far as we are aware, allowed a plaintiff to *mix* the two and selecting from each the most desirable elements from plaintiff's point of view, rely upon the result arising from the mixture thus compounded. Hence, the effect of the statute and its method of computation may be disregarded in this case, nor would they change the result if followed. Defendant was entitled, either under the terms of the policy or of the statute, to deduct the admitted indebtedness. It, of course, would necessarily lessen the actual value of this, or of any other, policy. [Alexander v. Mutual Life Ins. Co., 290 S. W. 452; Leeker v. Prudential Ins. Co., 154 Mo. App. 440; McCall v. International Life Ins. Co., 196 Mo. App. 318; Ruans v. Manhattan Life Ins. Co., 194 Mo. App. 214.]

Many other points are raised and discussed in the briefs, but, as we view the case, they need not be noticed in this opinion. It is manifest that, from whatever angle the case is viewed, the plaintiff is not entitled to recover. The situation which arose came, not from any wrongful or unauthorized act of defendant, but out of the failure of insured to perform his duty in reference to the payment of premiums and his acceptance and acquiescence in what then became due him under the policy in reference to extended insurance. Unfortunately, so far as recovery herein is concerned, insured outlived the term of such insurance. Plaintiff had no vested interest in the policy; insured could change the beneficiary whenever he chose; so that what he did in causing, and thereafter consenting to or acquiescing in, the insurance contract as made and changed by his acts, must control the rights of plaintiff. As said in Citizens National Life v. Morris, 104 Ark. 288, ''The court cannot make

contracts for the parties, and it is its duty to enforce them as the parties have made them.''

It follows that the judgment must be reversed. It is so ordered. All concur.