NEW YORK LIFE INSURANCE CO., PLAINTIFF, v. JOHN WRIGHT ET AL., RESPONDENTS, GERTRUDE WRIGHT, APPELLANT.—88 S. W. (2d) 403.

Kansas City Court of Appeals. May 13, 1935.

On rehearing December 2, 1935.

*Wm. H. Sapp* and *W. W. Dalton* for respondents, John W. Wright and George W. Hulett.

*Clark, Boggs, Peterson & Becker* for appellant, Gertrude Wright.

BLAND, J.—This is a proceeding in equity to determine the ownership of the proceeds of a life insurance policy issued by the plaintiff, New York Life Insurance Company, insuring the life of Ray W. Wright. Said Wright died on September 3, 1933. The policy was for $4000. Prior to August 30, 1933, the policy was payable as follows: To John W. Wright, Father, $1500, George W. Hulett, a business partner, $650 and the balance to the wife of the insured, Gertrude Wright. The policy reserved to the insured the right to change the beneficiaries. After August 30, 1933, upon the written request of the insured of that date, the policy was made payable as follows: To John W. Wright, $500 and the balance to Gertrude Wright.

It appears that $839.85 had been borrowed upon the policy, leaving a balance of insurance of $3208.09, which was payable upon the death of the insured. After that event plaintiff changed the beneficiaries in the policy in accordance with the request of the deceased made on August 30, 1933. Thereafter, in accordance with the change in the beneficiaries, Gertrude Wright, demanded of the plaintiff the proceeds of the policy, after the payment to John W. Wright of $500 due him. John W. Wright and George W. Hulett claimed that the change of the beneficiaries was void and demanded that plaintiff settle in accordance with the terms of the policy as it existed prior to the change. Those claims resulted in the plaintiff bringing this proceeding in the Circuit Court of Boone County by the filing of a bill of interpleader asking that the respective parties interplead for the amount payable under the policy. Plaintiff paid the money

into court and was discharged. The court required the parties claiming under the policy to interplead.

The plea of George W. Hulett and John W. Wright set up that the request for the change of beneficiaries executed on August 30, 1933, was null and void because, at that time, the insured was of unsound mind and was unduly influenced to execute the application for the change of beneficiaries by his wife, Gertrude Wright. By her interplea Gertrude Wright claimed the right to that part of the proceeds of the policy given to her by the change of the beneficiaries resulting from the request of August 30, 1933. The court in rendering its decree filed a "memorandum of decision" in which it is stated that the evidence of unsound mind "is inconclusive for it appears that decedent was irrational at times and other times not." However, the court found that the change of beneficiaries was procured through the exercise of undue influence on the part of Gertrude Wright over her husband and rendered judgment accordingly. The interpleader, Gertrude Wright, has appealed.

The evidence discloses that during the latter part of June, 1933, insured, who for sometime had been suffering from arteriosclerosis, heart trouble, Bright's disease, uraemia and high blood pressure, became worse and was confined in a Columbia hospital, in which city he resided, for a few days and was then removed to Barnes Hospital in St. Louis, entering there on July 18, 1933. The following day he had a stroke of paralysis and was in a comatose condition for several days. Upon examining insured in the hospital the physicians there arrived at the conclusion that insured's condition was extremely serious and that his death was only a matter of a few days. He had a very bad pulse, his respiration was poor and there were other grave symptoms indicating that he was near dissolution. This lasted three or four weeks. After the expiration of that time his condition was somewhat improved but about a week or ten days before his death he took a change for the worse.

According to the evidence of the interpleaders, Wright and Hulett, at times insured's conversation was disconnected, his mind wandered, he was strapped in bed and at other times he was irrational. One time he imagined he had bought land and rice fields and saw a big river with machines crossing and miring in it. One witness for said interpleaders, testified that "he never realized he was in the hospital, he was always in a barn or stable;" that while appearing to read the newspaper he held it upside down or sideways. However, this witness testified: "There were a few times that he didn't recognize us—when we would speak to him—but he never could have a connected conversation." At times his conversation would be rambling. He would doze off to sleep while holding a conversation. One time he thought he was taking an automobile journey to see a friend but

was unable to get there on account of bad roads. There was also other testimony of irrational acts of a similar character. However, a careful examination of the testimony of witnesses for Wright and Hulett, interpleaders, discloses that there were many times during which insured was rational during his confinement in the Barnes Hospital.

Said interpleaders placed upon the stand four physicians, none of whom saw insured in the Barnes Hospital, but one of whom had treated him before he went there, and each of these physicians testified in answer to a hypothetical question propounded to them, based upon hospital records concerning insured, that insured was insane during all of the time that he was in the Barnes Hospital. Some of these medical experts had examined the hospital records. One said that he did not examine the "whole record" "minutely;" another that he examined the record "rather briefly only;" another, "I glanced over them." However, the hypothetical question propounded to them was based on only a part of the hospital records and wholly ignored the daily record or chart made of the patient and did not submit the condition of the patient from August 11 to September 3, 1933, but merely that the patient showed some improvement from August 11 to August 25. No information whatever was submitted from August 25 to September 3. It is claimed by the applicant that the court erred in admitting the evidence of the experts but we need not pass upon this question for the reasons hereinafter to be stated.

There were seven lay witnesses who testified for said interpleaders, all of whom stated that, in their opinion, insured was insane while in the Barnes Hospital. One of them was the interpleader, John W. Wright, two sons of said Wright, one daughter, one son-in-law, one daughter-in-law and one who was not related. Only three of these witnesses saw insured on the date that the application for the change of beneficiaries was signed. The evidence shows that it was signed by the insured shortly after lunch on August 30, 1933. The three witnesses for said interpleaders who testified relative to what they observed about insured on August 30, were John W. Wright, Fulton Wright and Hattie Shulter. The last testified that she saw insured on the evening of August 30 after the evening meal; that he was almost asleep; that "He didn't seem to be interested in us or in anything. We spoke to him and he spoke, but never said anything more to me. I didn't carry on any more conversation, and I wasn't sure the doctors had not given him medicine to put him to sleep, as they did every night." . . . "Q. How long were you there? A. I went out and talked to those friends about staying, then back again. Q. And did he recognize you? A. Just when I went in. Q. How long were you there? A. Well, I went in and

stayed about twenty minutes and then out to talk to those folks and then back for about thirty-five or forty minutes. Q. Had he been given his medicine to go to sleep? A. No. They didn't give it to him when he was so low that he didn't have to have it. At least, the doctors didn't tell me they did, but I didn't see any medicine administered to him at all that night."

John W. Wright testified that he was there the night of the day that the request for the change of beneficiaries was signed and that insured "wasn't in very good condition. . . . He was in a bad fix." Asked if insured knew him he stated: "Well, I cannot be positive. It seemed he did recognize me for a second or two."

Fulton J. Wright, a son of the interpleader, John W. Wright, testified that he saw insured on the night of the day that the request for the change of beneficiaries was signed; that he was there about seven o'clock and stayed about fifteen minutes; that there was no one with him and that no nurse or doctor was present. He testified: "Q. What did he say on this particular date? A. Well, he said, 'Hell, do you want it all? Ain't you satisfied'? and mentioned about these bills. Q. And that is all he said on that date. What was his physical condition, the best you could judge, at that time? A. Real bad." . . . "Q. When you went in what did you say to him? A. I asked him how he felt. Q. What did he say? A. 'Who are you? Have you got some more papers?' Q. Said what? A. 'Have you got some more papers?' Q. What did you tell him when he asked who you were? A. I told him I didn't have no papers and 'don't you know me?' and he says, 'No,' I said. 'This is "Baldy"—don't you remember me?' . . . 'Oh, Hell, yeah—oh, I am all right.' Q. Was it light or dark in there? A. Light. Q. The light was on? A. Yes. Q. Is that all that you said to him that evening? A. I think so."

The interpleader, Gertrude Wright, testified that she was with insured while he was in Barnes Hospital all of the time except when she was away on two business trips of three or four days each; that during all of the rest of the time she was with insured, day and night at the hospital; that the request for the change of beneficiaries was signed sometime after lunch on August 30; that prior to that time she and her husband had talked about losing their home and that insured had nothing to leave her but his insurance, which consisted of the policy in question and another one in the sum of $5000. Insured expressed regret that he could not leave more "because I had all the bills to pay," that is, doctor and hospital bills; that about this time the witness went through bankruptcy; that insured was out of bed sitting up most of the time that he was in the hospital; that he could walk and go to the toilet; that he received and read mail while he was in the hospital; that this mail consisted of

a few letters received along about from August 3 to August 29; that after he got some better, which was about two weeks after he went to Barnes Hospital, he read the "Columbia Daily Tribune every day;" that when insured was in a private room he would go to the sun parlor or sun porch and watch the base ball game across the street. When the request for the change of beneficiaries was signed by insured no one was present save his wife. The witness expressed the opinion that insured was of sound mind at the time of the execution of the request for the change of beneficiaries. She further stated that insured customarily chewed tobacco and smoked cigarettes and that he continued this custom while he was in the hospital. She denied that he was ever strapped in bed but stated: "For the first couple of weeks they had a canvas that was wrapped up to his waist, but no further than his waist. Q. Well, we will say 'wrapped' instead of 'strapped' in. It held him in? A. It held him from falling out;" that she never heard him make any statements about being in a livery barn or taking automobile trips or anything about rice fields; that "after he was there two weeks he never talked out of his head at all, but the first two weeks he was ill. Q. After about the first of August he was never out of his head at all? A. He was the first two weeks he was there. The first two weeks he was in the hospital, he knew me every day. Q. Did you ever see him reading the paper upside down? A. No, sir."

Gertrude Wright obtained the blank application for the change of beneficiaries from plaintiff's local agent at Columbia. It appears that the plaintiff required the signature of insured to be witnessed. The name of Mrs. Quigley, who lived at Shelbina, appears upon the application for the change of beneficiaries as a witness. Mrs. Quigley's husband was in Barnes Hospital which accounts for Gertrude Wright's acquaintance with Mrs. Quigley. Insured did not sign the application in the presence of Mrs. Quigley, nor was she acquainted with the signature of the insured, but the witness exhibited the application to Mrs. Quigley in the lobby of the hospital and told her that insured was making over the insurance to the witness and that she desired Mrs. Quigley to sign the papers to show that the witness was the wife of the insured.

After the death of the insured the witness called upon Mrs. Quigley at Shelbina and asked her to testify that the application was signed by the insured in the presence of Mrs. Quigley. Mrs. Quigley refused to do this. Upon the taking of the deposition of Gertrude Wright she first denied knowing Mrs. Quigley. Then she stated that she did not know Mrs. Quigley's address. She stated that she had sent a Christmas card to Mrs. Quigley addressed to the hospital and it had been returned. The witness at the trial attempted to excuse her misrepresentations as to her knowledge of Mrs. Quig-

ley's whereabouts by saying that the latter stated to her that she expected her husband to die any day and she did not want to be bothered; that the witness told her that she would not "tell anybody anything about her." Mrs. Quigley testified for the interpleaders, Wright and Hulett. She denied, in effect, that she requested that her whereabouts be not disclosed.

Three lay witnesses testifying for the interpleader, Gertrude Wright, gave as their opinions that deceased was sane but none of them saw him while he was in the hospital in St. Louis, but shortly before he went there.

One physician, testifying for said interpleader, who had treated insured from the middle of October, 1932, to June, 1933, expressed the opinion that during that time insured was of sound mind. He further testified that he had examined the records of Barnes Hospital and found that the death of insured was caused by coronary thrombosis; that "there is nothing on the chart (hospital) to indicate that there was any unsound mental condition in the patient."

It appears that in keeping the daily records of the Barnes Hospital it is the custom to note on the record as to whether the patient is irrational. The daily chart of the insured introduced in evidence shows on August 28 the following condition: "Very little dyspnea tonight; this morning ate all breakfast. Mr. Wright complains of weakness but says breathing seems easier. The patient slept some early in the afternoon, has been out of bed very little today. Mr. Wright seemed to have a fair day, complains of abdominal discomfort since eating." His breakfast consisted of milk and coffee. At noon he had milk and soup. In the evening he had milk. He slept some during the day. In the twenty-four-hour summary the chart recites that he was given medicine for indigestion and "patient today had a fair day." On the morning of August 29 the patient was given a hair cut. He ate all of his breakfast consisting of peaches, pettijohn toast, coffee, cream, milk, tomato juice and graham crackers. For lunch he had soup, milk, beef, noodles, tomatoes and bread. At four P. M. "patient is sitting up in chair." "Mr. Wright had a fair day. Complains of slight discomfort after eating tonight. Voice sounds as though he has slight cold; nauseated, vomited undigested food." For dinner he had milk and soup. The chart for August 30 shows that during the previous night he slept well, "had a good night." "Patient sat up in chair while bed was being made." At four P. M. the chart recites that the "patient has been up in chair most of P. M., no complaints." At six P. M. "has had good day, comfortable this evening." At ten P. M. he was given amytol (a sleep medicine), "he had a comfortable day." For breakfast he had the regular diet consisting of coffee, milk, cream, tomato juice, farina and sausage. For lunch he had milk and soup, ragout, potato,.

beans and spanish C. At two A. M. of the 31st the chart recites that the patient was having difficulty in going to sleep. He slept part of the night but was restless. In the morning he "seemed to breathe with more difficulty than usual." Four P. M. "patient short of breath." Six P. M, "patient seemed to have fair day." The summary for the day recites that the "patient restless last night, seemed disturbed." His meals that day consisted of a diet similar to that of the previous day. On September 1, the patient became somewhat worse and on September 2, he became very much worse and died on the next day at eleven-fifteen P. M.

The chancellor in his "memorandum of decision" stated that the request for the change of beneficiaries was instigated by the interpleader, Gertrude Wright, and without stating the evidence relating to the matter, we think that the evidence fully substantiates this view.

The burden was upon the interpleaders, Wright and Hulett, to sustain the allegations of their interplea to the effect that insured was insane, or, in other words that he did not have sufficient mental capacity to execute the application for the change of beneficiaries at the time it was made. We agree with the chancellor in his conclusions as follows:

"The issue, unsoundness of mind, was stressed throughout the trial. Evidence upon that subject, standing alone, is inconclusive, for it appears that decedent was rational at times and at other times not."

In other words said interpleaders did not sustain the burden of proof cast upon them. While it is true that insured was a very sick man all of the time that he was in Barnes Hospital, the evidence fairly shows that he had periods when he was rational and the daily charts of August 28, 29 and 30 indicate that he was by no means a dying man. At that time he was able to be out of bed, sitting up, and he was fairly comfortable. His appetite seemed to be good. He ate rather heartily for an extremely sick man. There is no claim that insured suffered any mental incapacity as a result of anything but his illness, the claim being based entirely upon the condition of his sickness. We give very little weight to the opinions of the lay witnesses as to the sanity or insanity of insured. Most of these witnesses were relatives of the parties. Some of them did not see insured on the day that the application for the change of beneficiaries was signed. The evidence of the lay witnesses regarding insured's mentality and the irrational things that he did is in dispute. Under all of the circumstances, we give more credence to the records of the hospital. We have been unable to find from the hospital records that he was irrational, insane or out of his mind near the time when he executed the request for the change of beneficiaries. The hypothetical questions propounded to the medical experts by the

interpleaders, Wright and Hulett, excluded the information contained in the daily chart of the patient and did not submit his condition from August 11 to September 1. Without passing upon the propriety of these questions but giving them the weight that they otherwise merit and taking the evidence as a whole, we are not prepared to say that the evidence discloses that insured was insane at the time he executed the request for the change of beneficiaries.

It is true that the testimony of the interpleader, Gertrude Wright, was discredited to a certain extent by reason of her effort to suppress the whereabouts of the witness, Mrs. Quigley. But we have given very little weight to the testimony of Gertrude Wright in disposing of the case. We rest our decision largely upon what is disclosed by the hospital records and the fact that all of the witnesses, on both sides, when their testimony is studied in detail, discloses that there were times when insured was rational and there is no testimony whatever that he was not in that condition when he signed the application. No witness saw him at that time except the interpleader, Gertrude Wright. The three witnesses for th interpleaders, Wright and Hulett, who saw him on that day were not there until night and their testimony consists largely of conclusions and even the testimony of Fulton Wright, shows that when insured was aroused he knew him. In addition, as before stated, insured's condition on the night of August 30 might very well have been entirely different from that immediately after lunch of that day.

On the question of undue influence, it is claimed by the interpleader, Gertrude Wright, that the interpleaders, Wright and Hulett, did not have such a vested interest in the policy as to give them the right to maintain an action to set aside the change of beneficiaries on the ground of undue influence. It is well settled that the beneficiary in a life insurance policy has no vested interest in the policy but merely has an expectancy which may be terminated by the insured at any time. [Schlereth v. Neely, 285 S. W. 168, and cases therein cited; Dougherty v. Mutl. Life Ins. Co., 44 S. W. (2d) 206, 216.]

However, we approve of what was said in the case of Ryan v. Boston, etc., Assn., L. R. A. 1916C, 1130, 222 Mass. 237, 110 N. E. 281:

"Owing to the nature of a beneficiary association, the person designated in the certificate has a mere expectancy, and not a vested right in the anticipated benefit. [March v. Supreme Council, A. L. H., 149 Mass. 512, 4 L. R. A. 382, 21 N. E. 1070; Stat. 1911, Chap. 628, Par. 6.] The right of the designated beneficiary is not one of property, yet it is of sufficient potentiality at law or in equity to permit contracts and other obligations in reference thereto which are binding and enforceable in equity after the happening of the

event which automatically enlarges the contingent interest to a vested right.''

That the beneficiary has such a right in the policy, after the death of the insured, as to enable him to maintain an action on his part seeking to nullify a change from himself to another where the change was brought about by fraud or undue influence or where the insured was insane, is established by many respectable authorities. [Wherry v. Latimer, 103 Miss. 524; Daugherty v. Daugherty, 152 Ky. 732; Munroe v. Beggs, 91 Kan. 701; Grand Lodge A. O. U. W. v. Frank, 133 Mich. 232; Woodmen of the World v. Broadwell, 114 Mo. App. 471; McAllister v. Security B. Assn., 261 S. W. 343; Cason v. Owens, 100 Ga. 142; Grand Lodge v. McGrath, 95 N. W. 739; Sluder v. Natl. Ams., 166 Pac. 482; McMurtray v. McMurtray, 67 Okla. 50; Goyt v. The Natl. Council et al., 178 Ill. App. 377.]

It is true that there is authority to the contrary. See Hoeft v. Supreme Lodge K. of H., 113 Cal. 91; N. Y. Life Ins. Co. v. Dunn (Cal.), 188 Pac. 1028; Alfsen v. Crounch, 115 Tenn. 352, but we think the better rule is as announced by the cases first cited on this point.

However, we do not find that there is sufficient evidence to establish that the application for the change in beneficiaries was procured by reason of undue influence exercised by interpleader, Gertrude Wright, over her husband, the insured. There was no confidential relationship, within the meaning of the law, existing between the insured and Gertrude Wright. In order to show undue influence it was not sufficient to prove merely mental weakness of the insured by reason of illness and the proof must have been clear and convincing and not resting on suspicion or mere opportunity to influence. [Patton v. Shelton, 40 S. W. (2d) 706; Minturn v. Conception Abbey, 61 S. W. (2d) 352.] Insured owed a duty to his wife to provide for her after his death and she had the right to see that this duty was fulfilled so long as she used no improper means. [Beckmann v. Beckmann, 331 Mo. 133.]

"The proof of undue influence alone is not sufficient. It must be *undue*. Nay, the proof of such over-mastering influence of one spouse over another as might mould and guide the will of the other is not sufficient. There must be evidence that such influence was brought to bear, and that the effect was produced or sprang naturally by way of inference from facts proven. Conceding that undue influence cannot as a rule be proven by direct and positive testimony, but oft must needs rest in inferential proof, yet we have read this record in vain to find such inferential proof. Unless influence to be effective in breaking a will should be of sufficient potency to destroy the free agency of testator at the time of making the will. The influence of natural affection is not sufficient; for natural affection may flow at all times and its waters are under no ban known

to the law. The undue influence that will break a will must be present, in active exercise and rise to the mark of such overpersuasion, coercion, force, fraud or deception, as breaks the will power of testator and puts in its stead the will of another.'' [Turner v. Anderson, 236 Mo. 523, 541.]

There is nothing in the record before us to indicate the use of undue influence except mere suspicion. It is true that interpleader, Gertrude Wright, instigated the change; that when insured first went to Barnes Hospital she attempted to get insured's sister to help her have the policy changed so as to eliminate interpleader, Hulett, as a beneficiary, on the theory that John W. Wright would thereby get more of the proceeds of the policy; that she procured the application for the change from the local agent of the company and that he told her that he would have nothing to do with the matter as he thought insured was in no condition mentally to request a change; that he instructed her that the application must be witnessed and that she did not have this done, but procured it to be signed by Mrs. Quigley as a witness, outside of the presence of the insured, according to the testimony of Mrs. Quigley; that said interpleader testified at the trial that Mrs. Quigley was in the room when insured signed the application and that the witness told her in the presence of insured that the latter wanted her to witness it; that said interpleader did not disclose that insured had signed the application for the change until after his death; that she attempted to hide the whereabouts of Mrs. Quigley and to get her to testify that the application was signed in Mrs. Quigley's presence; that the application was not signed in the presence of anyone except the said interpleader.

These are all suspicious circumstances, but nothing more. There is no substantial evidence that interpleader said a word to insured about changing the beneficiaries or used any influence whatever upon him unless it can be said that her suspicious conduct is to be taken as such proof. The authorities do not so hold.

There are other suspicious circumstances claimed by the interpleaders, Wright and Hulett, but we do not regard them of any great importance.

It was shown that sometime prior to the signing of the application, interpleader, Gertrude Wright, told insured's sister that she ''got on the nerves of the insured.'' Thereupon the sister did not come to see the insured for a time but did return a day or two before the application was signed. When she returned insured did not say she ''got on his nerves'' or the like. It is claimed that Gertrude Wright by this conduct was trying to get the sister out of the way so that she could get insured's signature to the change. It is also claimed that Gertrude Wright would not permit the doctors to examine insured's brain at the autopsy. The evidence in this re-

spect was that insured's relatives objected to any autopsy being held but that Gertrude Wright gave her consent but in the writing she signed she stated that the brain was not to be examined. Whether this was a result of the objection by insured's relatives to any autopsy whatever the evidence is not clear. Our attention is called to the testimony that when Fulton Wright came into the sick room on the night of August 30, that insured made remarks about the payment of bills and seemed annoyed about someone wanting him to sign more papers and saying, "Hell, do you want it all, ain't you satisfied." The chancellor gave some weight to this testimony but, assuming it to be true, it would be a mere guess as to whether the insured meant that his wife had been unduly pressing him about signing an application for a change of beneficiaries in her favor. There is no question in our minds but that the effort of interpleaders, Gertrude Wright, in suppressing the fact that the application for a change of beneficiaries had been signed by the insured and to prevent the whereabouts of Mrs. Quigley from becoming known, shows at least a doubt in her mind as to the propriety of what had been done. By no means indicating our approval of her conduct, quite to the contrary, we are unable to conclude that the evidence is such as to show she exercised undue influence over the insured in the premises in the light of the requirements of the law upon one who asserts undue influence, as to the extent of the proof demanded.

Interpleaders, Wright and Hulett, attempted to show that the insured in 1925 became indebted to his father, John W. Wright, and that when the former changed his policy in May, 1933, he owed him $1925 and that it was then changed so as to make his father a beneficiary therein to the extent of $1500 in order to protect his father, at least in part, against loss on this indebtedness. The court refused to permit this evidence to be introduced. There is nothing in the pleadings of either one of the said interpleaders basing a right to have the proceeds of the policy paid as directed therein prior to the change of the beneficiaries on the ground that John W. Wright was a creditor of the insured and, in fact, there is no pleading or evidence that there was any agreement between insured and the said John W. Wright that the latter should be made a beneficiary in the policy to the extent of $1500 upon the consideration of the indebtedness aforesaid. So there is nothing in the case to suggest that said John W. Wright has any equity in the proceeds of the policy based upon contract.

The judgment is reversed and the cause remanded with directions to the trial court to render judgment in the sum of $500 in favor of the interpleader, John W. Wright, and judgment for the interpleader, Gertrude Wright, for the balance of the proceeds of the insurance policy in question, and against George W. Hulett. All concur.

## On Rehearing.

SHAIN, P. J.—This cause was argued and submitted at the March. term, 1934, of this court and an opinion was then written by Judge BLAND of this court and handed down reversing the judgment and remanding the cause with directions.

A rehearing was granted by this court and the case re-argued and resubmitted at the October term, 1935, of this court.

From a careful examination of the record, argument and briefs, we conclude that the conclusion reached in the first submission should be upheld and we therefore adopt the opinion of Judge BLAND in its entirety as handed down on May 13, 1934, but deem it not inappropriate to add the following:

The respondents urge that the opinion by Judge BLAND is not in harmony with Manahan v. Manahan, 52 S. W. (2d) 825, 1. c. 828, 829, and Dimity v. Dimity, 62 S. W. (2d) 862, 863.

In the Manahan case it is shown that two of her sons stealthily and secretly secured a deed from their aged, sick and dying mother and withheld the same from record until her death was immediately impending when same was filed for record.

In the Dimity case, a son who was the confidential agent of his mother secretly secured a deed from her. It was disclosed that the mother was weak, declining in health and was eccentric and very nervous and irritable.

The courts in the above cases comment freely upon the confidential relationship and the underhanded and secretive tactics of the sons in procuring the deeds and said conduct and acts on the part of the sons were prime factors in the reaching of the conclusion that the deeds should be set aside.

The question arises as to whether or not the conduct of the wife, as testified to in the case at bar, must be considered in the same light as was the conduct of the designing sons in the Manahan and Dimity cases, supra.

In our opinion the position of the wife in the case at bar is materially different than was that of the sons in the above cases.

Herein is shown lingering sickness upon the part of the husband with its constant drain upon the family resources. There is a direct obligation upon a husband to make provision for his wife and we conclude that a wife has the right to insist on her rights in said respect. One's acts in seeking rights must not be measured by the same standard as are the acts of those seeking advantage that is not of right.

Just one further comment: The question of change of beneficiary is governed by the conditions expressed in the policy. That was a matter between the insurer and insured. While we might condemn

the act of a person seeking to procure improper proof of signature, still as there seems to be no doubt but that the husband did sign the application to change, and the company has accepted the proof and made the change, we conclude that the testimony concerning the wife's attempt to secure the proof wrongfully is not controlling as to the issue in this case. The judgment is reversed and remanded with directions in conformity with the orders and directions as set forth in the opinion by Judge BLAND of May 23, 1935, aforesaid. All concur.